Kevin L. HARRIS, Plaintiff,

v.

Arthur RODERICK, et al., Defendants.

Civ. No. 94–0359–S–BLW.

United States District Court, D. Idaho.

May 28, 1996.

978

David Z. Nevin, Ellison M. Matthews, Boise, ID, for Kevin L. Harris.

Charles S. Leeper, Karl N. Metzner, Spriggs & Hollingsworth, Washington, DC, for Arthur Roderick, Larry Cooper, Jose Antonio "Tony" Perez and Henry Hudson.

Michael L. Martinez, Edward V. Hickey, Holland & Knight, Washington, DC, for G. Wayne "Duke" Smith.

Brendan V. Sullivan, Jr., Glenn J. Pfadenhauer, Kathleen H. Quimby, Williams & Connolly, Washington, DC, for Richard Rogers, Steve McGavin, Les Hazen, Dale Carnege, William D. Gore and Eugene F. Glenn.

Dan K. Webb, Howard M. Pearl, Winston & Strawn, Chicago, IL, for Larry Potts.

Earl J. Silbert, Adam S. Hoffinger, Jeffrey D. Clark, Schwalb Donnenfeld Bray & Silbert, Washington, DC, for Lon T. Horiuchi.

D. Marc Haws, Asst. U.S. Atty., Boise, ID, Rupert Mitsch, U.S. Dept of Justice, Civil Division, Washington, DC, for U.S.

## MEMORANDUM DECISION AND ORDER

WINMILL, District Judge.

### I.

### INTRODUCTION

The Court has before it Motions to Dismiss filed by the Defendants. The Court heard oral argument on the Motions, and they are now at issue. In addition, the Plaintiff has filed a Motion to Preserve Evidence. The Court will resolve the Motions after reviewing the legal standards governing Motions to Dismiss and the allegations contained in Plaintiff's Second Amended Complaint.

### II.

### LEGAL STANDARDS GOVERNING MOTIONS TO DISMISS

A Motion to Dismiss should not be granted "unless it appears beyond doubt that Plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the non-moving party. *Buckey v. County of Los Angeles,* 968 F.2d 791, 794 (9th Cir.), *cert. denied,* 506 U.S. 999, 113 S.Ct. 599, 121 L.Ed.2d 536 (1992). Generally, the Court may not consider any material beyond the pleadings in ruling on a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994). If materials outside the pleadings are considered, the Motion is converted to a Motion for

Summary Judgment governed by Rule 56. In this case, the Court has not relied on any material outside the pleadings for making the rulings contained in this decision. The Court takes the factual allegations in Plaintiff's Second Amended Complaint as true, and will restate and review those allegations before resolving the Motions to Dismiss.

## III.

### ALLEGATIONS CONTAINED IN SECOND AMENDED COMPLAINT

In 1992, Plaintiff Kevin Harris lived with Randy Weaver and Weaver's family on Ruby Ridge in northern Idaho. On August 21, 1992, six Deputy United States Marshals (DUSMs), including Defendants Roderick and Cooper, went onto Weaver's property. "The ostensible purpose of the DUSMs was to serve, or to prepare to serve, an arrest warrant upon Randall W. Weaver." *Plaintiff's Second Amended Complaint at p. 7,* ¶ *29.*

"[A]t the intersection of two primitive roads near the Weaver property known as 'the Y,' [DUSMs] Cooper, Degan [William Degan], and Roderick, confronted Kevin Harris, Randall W. Weaver, Weaver's 14–year old son Sammy, and the Weaver family dog, ... Striker." *Id.* at p. 7, ¶ 31. Harris asserts that Roderick fired a shot killing Striker. "In surprise and fear at seeing his dog shot and killed, [Sammy Weaver] swore at Roderick and fired two shots from his rifle in Roderick's direction. He then turned to run home calling to his father, 'I'm coming, Dad....'" *Id.* at p. 8, ¶ 33. Harris then asserts that after Sammy's shot, "the woods where Cooper and Degan were hiding erupted with gunfire...." *Id.* at ¶ 34. Sammy was wounded by a shot from Degan, and then killed by a shot from Cooper. *Id.* William Degan was also shot and killed. Harris asserts that he fired shots "in lawful self defense" and concedes that he "may have fired the shot which killed William Degan." *Id.* at pp. 8–9, ¶ 35.

After this incident, "Cooper and Roderick met and decided to lie about how the incident actually occurred. In particular, they decid-ed to say that Kevin Harris fired the first shot at the 'Y,' and that he otherwise acted solely as an aggressor and not in self defense." *Id.* at ¶ 37. "As a result of these lies, a warrant was issued for the arrest of Kevin Harris and he was charged with murder." *Id.* at ¶ 38.

In response to these events, the FBI's Hostage Rescue Team (HRT) arrived at Ruby Ridge on August 22, 1992. "The HRT ordinarily operates under the FBI's Standard Rules of Engagement. These rules provide that an FBI agent may kill a person with whom he or she comes into contact only when the person presents an immediate risk of death or great bodily harm to the agent or to another person." *Id.* at p. 10, ¶ 42. In this case, however, the HRT approved Special Rules of Engagement under which "*any* armed adult observed in the vicinity of the Weaver cabin could and should be killed. Thus, an armed adult was to be killed, irrespective of whether the person had been warned of the presence or identity of FBI agents, or posed a risk of flight or a threat of death or serious injury to anyone." *Id.* at ¶ 43 (emphasis in original). Later, the Special Rules of Engagement were modified to provide that "any armed adult *male* observed in the vicinity of the Weaver cabin could and should be killed." *Id.* at ¶ 45 (emphasis in original).

At about 6 p.m. on August 22, 1992, Randy Weaver, his daughter Sarah, and Kevin Harris left the cabin and walked to a nearby shed. As Randy Weaver reached up to open the latch to the shed, he was shot in the back by HRT sniper Lon Horiuchi. Randy Weaver yelled that he was shot, and started running back to the cabin with Sarah and Kevin Harris. As the threesome ran through the front door of the cabin, Horiuchi fired a second shot, intending to kill Harris and Vickie Weaver. *Id.* at ¶s 58–59. At this time, Vickie Weaver had heard her husband's shouts and was holding open the front door of the cabin. "The bullet from Horiuchi's rifle struck a clear window in the open door, passing through it and into the head of Vickie Weaver who was standing immediately behind the window, passing through Vickie Weaver's head and into the upper left arm

and chest of Kevin Harris." *Id.* at p. 13, ¶ 55. Vickie Weaver died instantly, and Harris "suffered very nearly fatal gunshot wounds." *Id.* at ¶ 57.

Harris remained in the cabin for eight days, "in such intense physical pain and suffering, and also suffering from emotional despair, that he requested other persons present in the cabin to kill him, in order to end his misery and suffering." *Id.* at p. 15, ¶ 69. When he surrendered to authorities, Harris was taken to a hospital in Spokane where he remained in intensive care for twelve days. As a result of his injuries, Harris alleges that he continues to suffer "extreme physical pain," and that he has suffered a "permanent partial disability," among other injuries. *Id.* at p. 37.

Harris was charged with first degree murder, and six other charges including assault and firearms violations. After a criminal trial lasting nearly three months, Harris was acquitted of all charges.

In this lawsuit, Harris has sued thirteen individuals—FBI officials and DUSMs—and the United States. His claims against the individual defendants include claims for the violation of constitutional rights under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). His claims against the United States are brought under the Federal Tort Claims Act, and include claims for assault, battery, and negligence, among others. There are no pending motions filed by the United States that are at issue, and thus its claims will not be discussed.

## IV.

### MOTIONS TO DISMISS

#### 1. *Motion to Dismiss Count One*

Count One contains a claim that DUSMs Cooper and Roderick used excessive force against Harris in violation of his constitutional rights under the Fourth and Fifth Amendments. More specifically, Count One asserts that DUSMs Cooper and Roderick used excessive force when they shot at Harris at the "Y," thereby "seizing" him in violation of his Fourth Amendment rights, and depriving him of liberty in violation of his Fifth Amendment rights.

■ To state a claim for a violation of the Fourth Amendment, Harris must show both that he was "seized" and that his seizure was effected with unreasonable force. *Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378, 1382–83, 103 L.Ed.2d 628 (1989). Defendants assert that Harris was never seized during the incident at the "Y" because he was not physically detained, was not hit by any bullets, and did not submit to the authority of the DUSMs.

■ A seizure "requires *either* physical force ... *or* where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) (emphasis in original). A physical force seizure "requires an intentional acquisition of physical control" by the officer, and occurs "only when there is a governmental termination of freedom of movement." *Brower*, 489 U.S. at 596, 597, 109 S.Ct. at 1381, 1382. But a physical force seizure "does not occur if an officer applies physical force in an attempt to detain a suspect but such force is ineffective." *U.S. v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995). With regard to a seizure by submission, the Ninth Circuit has held that "momentary hesitation and direct eye contact prior to flight [do not] constitute submission to a show of authority." *Id.* at 1407.

There is no allegation in Harris's complaint that he was physically detained at the "Y" or that he submitted to a show of authority. During oral argument, Harris's counsel represented that if he was permitted to amend the complaint, he would allege that once the DUSMs started shooting, Harris threw himself to the ground, crawled behind a stump, "and return[ed] fire on one or more—takes one or more shots." *Transcript of Oral Argument* at p. 52, ll. 13–20. Counsel also represented that about ten minutes elapsed from the time that Harris returned fire to the time he fled back to the cabin. *Id.* at p. 54, ll. 22–23.

Given the liberal standard applied to requests to amend a complaint under Rule 15, the Court will assume that Harris's requested amendment is part of his complaint. The question is whether Harris was seized when he was forced by gunfire to take cover. Under *Hodari D,* a seizure could occur either by physical force or by submission. The Court will examine first whether Harris has properly pled a seizure by physical force.

■ The Defendants assert that Harris's complaint fails to properly plead a physical force seizure because it does not allege that Harris was shot during the incident at the "Y." The Court finds this argument unconvincing. While *Hodari D* does quote from a fifty-year old treatise defining seizure to require *"touching* or submission," elsewhere, in Justice Scalia's own words, the majority opinion states that "seizure readily bears the meaning of a laying on of hands *or application of physical force* to restrain movement...." *Hodari D,* 499 U.S. at 626–27, 111 S.Ct. at 1550–51. The phrase "application of physical force" is used in the disjunctive with the phrase "laying on of hands," and thus broadens the meaning of seizure beyond a physical touching. The phrase is certainly expansive enough to mean that a person is "seized" when his movement is restrained by gunfire even if he is not actually hit by a bullet.

But while a physical force seizure may not require being shot, it does require "an intentional acquisition of *physical control."* *Brower,* 489 U.S. at 596, 109 S.Ct. at 1383 (emphasis added). It is difficult to understand how Harris could be under the physical control of someone he is shooting at. In fact, when he returned fire, Harris was acting entirely outside the control of the DUSMs. "A seizure does not occur if an officer applies physical force in an attempt to detain a suspect but such force is ineffective." *Hernandez,* 27 F.3d at 1407 (citing *Hodari D.* in support). Here, the force was ineffective: Harris returned fire for ten minutes and then fled. The DUSMs never acquired physical control over him. For these reasons, the Court finds as a matter of law, that the allegations of the Second Amended Complaint—as supplemented by the representa-

tions of counsel for Harris at oral argument—cannot under any interpretation state a cause of action for a physical force seizure in violation of the Fourth Amendment.

■ This leaves the issue whether Harris has properly pled a seizure by submission. Harris might have a strong case here if he simply dove for cover to avoid a hail of bullets. But Harris did more than seek safety—he returned fire.

The Court will assume the truth of Harris's declaration that he fired in self-defense. But even defensive shooting is hardly submissive behavior. By his own admission, Harris did not yield to authority but fought back. *Hodari D* and *Hernandez* stand for the proposition that there is no submission when a suspect flees. It would strain common sense to hold that a suspect who returns fire is more submissive than a suspect who flees. The Court therefore finds, as a matter of law, that the allegations of the Second Amended Complaint—as supplemented by the representations of counsel for Harris at oral argument—cannot under any interpretation state a cause of action for a seizure by submission in violation of the Fourth Amendment.

■ The Court turns next to the Fifth Amendment claim in Count One. The Supreme Court in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) held that the Fourth Amendment is the exclusive remedy for excessive force cases. Harris argues that the Ninth Circuit does permit Fifth Amendment claims when the government has used its power in an abusive, irrational, or malicious way. *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1409 n. 10 (9th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). But after the briefing was submitted in the present case, *Sinaloa* was overruled by *Armendariz v. Penman,* 75 F.3d 1311, 1326 (9th Cir.1996). The *Armendariz* case recognized that *Graham* makes the Fourth Amendment the exclusive avenue of relief for excessive force cases. Thus, the Fifth Amendment claim in Count One must be dismissed.

Even if some uncertainty remains about the applicability of the Fifth Amendment to excessive force cases, the Defendants are entitled to qualified immunity for this claim. Qualified immunity protects law enforcement officials from liability for civil damages unless their conduct violates "clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The defense requires a two-part inquiry: (1) Was the law governing the officer's conduct clearly established? (2) Under the law, could a reasonable officer have believed his conduct was lawful? *Browning v. Vernon*, 44 F.3d 818, 822 (9th Cir.1995). Harris bears the burden of proving the existence of a "clearly established" constitutional right. *Id.* If Harris satisfies that burden, then the Defendants bear the burden of establishing that their actions are reasonable, even if they violate Harris's constitutional rights. *Id.*

On August 21, 1992, when the incident at the "Y" occurred, Harris had no clearly established Fifth Amendment right to be free from excessive force applied by law enforcement agencies. At the very least, *Graham*—decided in 1989—made the law unclear. Defendants Roderick and Cooper are therefore entitled to qualified immunity for the Fifth Amendment claim contained in Count One.

In conclusion, the Court shall dismiss the Fourth and Fifth Amendment claims from Count One. Since those were the only claims contained in Count One, the Court will therefore dismiss Count One of the Second Amended Complaint.

**2. Motion to Dismiss Count Two**

Count Two alleges that DUSMs Roderick and Cooper conspired to deprive Harris of his Fourth, Fifth, and Sixth Amendment rights. Specifically, Count Two asserts that Roderick and Cooper lied about events at the "Y;" that these lies led to the Special Rules of Engagement; and that the Special Rules led to Horiuchi's shooting of Harris. In addition, Harris claims that the lies caused his later arrest, detention, and trial. Count Two asserts that Cooper and Roderick repeated their lies during official investigations; under oath before a United States Grand Jury; at two preliminary hearings before United States Magistrate Judges; and at the jury trial itself. These lies, Harris asserts, led to his illegal arrest in violation of his Fourth Amendment rights. In addition, the lies led to a "capricious prosecution based upon less than probable cause," which violated his Fifth Amendment rights. Finally, the lies resulted in an unfair trial in violation of his Sixth Amendment rights.

With regard to the Sixth Amendment claim, the Defendants moved to dismiss the claim on the ground that Harris had failed to state a cause of action. While Harris responded to similar arguments regarding his Fourth and Fifth Amendment claims, he offered no response to support his Sixth Amendment claim. The Court therefore deems it waived, and will dismiss that portion of Count Two alleging a Sixth Amendment violation.

With regard to the Fifth Amendment claim, the Supreme Court has held that the Fifth Amendment "may not furnish the constitutional peg on which to hang ... [the] tort [of malicious prosecution]." *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality). Harris characterized his Fifth Amendment claim in Count Two as one for malicious, or "capricious," prosecution. *See, Brief of Plaintiff* at p. 14. Thus, the Fifth Amendment claim in Count Two must be dismissed.

This leaves Harris's claim that his Fourth Amendment rights were violated when the lies of Roderick and Cooper led to his arrest, unsupported by probable cause. The Defendants seek to dismiss this claim on the ground that Harris has failed to plead a sufficient causal connection between the alleged lies and the arrest. In the Ninth Circuit, the conspiracy claim is subject to a heightened pleading standard. Specifically, Harris must allege "nonconclusory allegations" that are "specific and concrete enough to enable the defendants to prepare a response, and where appropriate, a motion for summary judgment based on qualified immunity." *Mendocino Environmental Center v.*

*Mendocino County,* 14 F.3d 457, 461 (9th Cir.1994). The Court has examined the Second Amended Complaint and finds that it meets this heightened pleading standard. Like the conspiracy claim approved by the Ninth Circuit in *Mendocino,* Count Two details the formation of the conspiracy, the motivation behind its creation, and the actions of the participants in furthering its alleged ends. The Court shall therefore reject this challenge to Count Two.

■ The Defendants assert next that even if Roderick and Cooper had reported the events at the "Y" as alleged by Harris, there remains the undisputed fact that Harris killed Degan. This killing, Defendants assert, supplied an independent and exclusive basis for probable cause, thereby making any lies inconsequential. In essence, the Defendants seek a ruling that the killing of Degan—regardless of the surrounding circumstances—automatically and as a matter of law constituted probable cause justifying the shooting, arrest, and detention of Harris.

Defendant's argument is contrary to the Ninth Circuit's general rule that in civil rights cases alleging violations of the Fourth Amendment, "a determination of ... probable cause requires an inquiry as to the facts and circumstances within an officer's knowledge ... [and] is a matter of fact to be determined ... by the fact finder." *Act Up!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir.1993). In other words, .probable cause is not determined by looking at one particular fact in isolation from all others. All the circumstances must be examined. And such an examination is not appropriate on a Motion to Dismiss. This argument shall therefore be rejected.

The Defendants claim qualified immunity from that portion of Count Two where Harris seeks recovery for his injuries caused by the gunshot wound inflicted by FBI sniper Lon Horiuchi. But as the Court will hold later in this opinion, the Court cannot find at this early stage of the litigation that Horiuchi's conduct was objectively reasonable as a matter of law.

■ Defendants also claim qualified immunity from that portion of Count Two where Harris seeks damages for his arrest and detention. Defendants assert that the individuals who carried out the arrest and detention had probable cause to support their actions, or, at the very least, had a reasonable belief that they had probable cause.

The Court has already held that the actual determination of probable cause is a question of fact that cannot be made in this Motion to Dismiss proceeding. But the qualified immunity question is somewhat different, and requires only a finding that the officers had *a reasonable belief* that probable cause existed. "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

In this Motion to Dismiss proceeding, the Court must assume Cooper and Roderick lied. Defendants other than Roderick and Cooper were involved in the shooting on August 22, 1992, and the subsequent arrest and detention of Harris. According to the Second Amended Complaint, these other Defendants relied on the lies of Roderick and Cooper in shooting, arresting, and detaining Harris. These other Defendants may assert a *Hunter* qualified immunity defense because they had no reason to doubt Cooper and Roderick.[1] But it would be anomalous to extend *Hunter's* qualified immunity to Cooper and Roderick because they lied so well that the arresting officers had no reason to doubt them. Defendants cite no cases holding that a defendant's own misrepresentations can provide the basis for a qualified immunity. defense. This argument shall be denied.

■ Defendants argue next that Count Two must be dismissed because Defendants have absolute immunity from claims of false testimony. They have no immunity, however, if their false testimony has played a role

---

1. The Court addresses the qualified immunity defenses of the Defendants other than Cooper and Roderick later in this decision.

in initiating a prosecution. *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *See also, Hervey v. Estes,* 65 F.3d 784, 788 (9th Cir.1995). Although Defendants assert that the Second Amended Complaint contains no express language charging them with initiating a prosecution, a fair reading of paragraphs 85(a) and (b) provides that the Defendants did in fact initiate prosecution. The Court will therefore reject the absolute immunity defense.

In conclusion, the Court shall grant that portion of the Motion to Dismiss seeking to dismiss the claims in Count Two based on Fifth and Sixth Amendment violations. The Court shall deny that portion of the Motion to Dismiss seeking to dismiss the Fourth Amendment violations from Count Two.

### 3. Motions to Dismiss Count Three

Count Three asserts that Roderick and Cooper deprived Harris of his Fourth, Fifth, and Sixth Amendment rights by lying about the incidents at the "Y." While Count Two was a conspiracy claim, Count Three is a straight constitutional violation claim. The parties did not make separate arguments regarding Count Three, but incorporated by reference their arguments regarding Count Two. The Court shall likewise treat the arguments on Count Two as applicable to Count Three, and shall make the same rulings. Thus, the claims for Fifth and Sixth Amendment violations in Count Three shall be dismissed, while the claims for Fourth Amendment violations shall remain.

### 4. Motions to Dismiss Count Four

Count Four alleges that DUSMs other than Roderick and Cooper, along with FBI agents, conspired to deprive Harris of his Fourth and Fifth Amendment rights. More specifically, Count Four asserts that Defendants conspired to change the Rules of Engagement to permit law enforcement officers to kill any armed adult male observed near the Weaver residence "irrespective of whether the armed adult presented an immediate threat of harm to the agent or to another person." *See, Second Amended Complaint* at p. 28, ¶ 98(d). Harris goes on to allege that he was shot because FBI sniper Lon

Horiuchi relied on these Special Rules of Engagement. *Id.* at ¶ 99.

■ The Defendants argue first that they cannot be liable for a conspiracy to use excessive force when the officer who actually applied the allegedly excessive force—Horiuchi—has qualified immunity for his conduct. Even if the Court cannot find as a matter of law that the shot was reasonable, Defendants assert, the Court can find that the law on excessive force was not clearly established and that Horiuchi has qualified immunity. Under either scenario, if Horiuchi is not responsible to Harris for the shooting, the other Defendants—whose liability is predicated on Horiuchi's shot—are also not responsible, according to Defendants.

Defendants assert that Horiuchi acted reasonably because at the time he shot Harris, he had probable cause to believe Harris had killed Degan, and Harris "was fleeing to the cabin, a secure position from which he would pose an *increased* threat to the officers." *See, Defendants' Brief* at p. 11 (emphasis in original).

The Supreme Court has held that an officer may use deadly force to prevent escape "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm...." *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). But assuming that the Second Amended Complaint is true, Harris was not escaping; he was retreating to a cabin surrounded by law enforcement officers. From the face of the Second Amended Complaint, there is no indication that Harris was threatening the officers in any way. The Defendants have candidly conceded that no reported case has found as a matter of law that the use of deadly force is justified when the victim poses no immediate threat to officers and is not escaping. *See, Defendants' Brief* at p. 13.

The Defendants assert, however, that even if Horiuchi was mistaken, his mistake was reasonable and hence entitles him to qualified immunity. In support of this argument, Defendants cite *Hegarty v. Somerset County,*

53 F.3d 1367 (1st Cir.1995), *cert denied*, —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1996).

In *Hegarty,* the police responded to a call that a distraught woman was shooting at campers. The police immediately suspected Katherine Hegarty since the shots were coming from her cabin. The police knew that Hegarty was a "crack shot" who was also emotionally unstable. *Id.* at 1370. The police decided to surround the cabin, and they took positions against the outside walls of the cabin. But they soon discovered that the walls were paper-thin. *Id.* at 1379. The officers feared that Hegarty could shoot them simply by firing from inside the cabin through the wall. The officers could not retreat without running through an area devoid of cover. *Id.* One of the officers saw Hegarty through the back window, and Hegarty aimed her rifle at him before he retreated. *Id.* at 1371. At this point, two officers prepared to break through the front door. Another officer saw Hegarty raise her rifle toward the door, and so he shot and killed her.

In the ensuing litigation brought by Hegarty's survivors, the Court found that the officers had qualified immunity. It was important in that case that there was an immediate threat to the officers; on two occasions just prior to the shooting, Hegarty had aimed her rifle at police. In addition, the officers were in dangerously exposed positions. *Id.* at 1379. The officers had to act quickly, and the Court rightly refused to use hindsight to condemn their actions. It is also important to note that *Hegarty* was decided on summary judgment, not on a motion to dismiss. *Id.* at 1372.

There is nothing in Harris's Second Amended Complaint indicating that Horiuchi was in a position of danger—or subject to an immediate threat—comparable to that faced by the officers in *Hegarty.* The Court therefore cannot make a ruling as a matter of law at this point in the proceedings that Horiuchi is protected by qualified immunity.

▮ The Defendants assert that they are nevertheless entitled to qualified immunity for drafting the Special Rules of Engagement because at the time the Rules were drafted, the Defendants knew that Degan had been killed by Harris, and that Harris posed a serious danger to law enforcement officers since he was armed and barricaded in a remote area. The Defendants cite no authority, however, analyzing similar rules of engagement under the *Garner* test discussed above. The Special Rules of Engagement permitted the use of deadly force without regard to whether the officers were in immediate danger or whether the suspect was escaping. In essence, the Special Rules of Engagement—according to the Second Amended Complaint—presumed that the officers were in constant immediate danger. The validity of that presumption under the test stated in *Garner,* is the central issue in resolving the Defendant's claim of qualified immunity. The Court is reluctant to pass on the issue without knowing all the circumstances surrounding the decision to draft the Special Rules of Engagement. Because this issue must await further factual development, the Court shall deny the Defendants' assertion that they are entitled to qualified immunity for drafting the Special Rules of Engagement without prejudice to their right to raise the issue at a later point in this litigation. At this time, Harris has at least pled this matter sufficiently in his Second Amended Complaint.

The Court shall also reject Defendants' claims that the conspiracy claim is insufficiently pled. The Court's examination of Count Four indicates that it—like Count Two—meets the Ninth Circuit's heightened pleading standard. *Mendocino Environmental Center v. Mendocino County, supra.*

Finally, the Court once again finds that the Fifth Amendment claim must be dismissed under *Graham.* The Court shall deny the Motion to Dismiss to the extent it seeks to dismiss the Fourth Amendment claim from Count Four.

### 5. Motion to Dismiss Count Five

Count Five alleges that Horiuchi—aided and abetted by the other Defendants—violated Harris' Fourth and Fifth Amendment rights by shooting Harris. The Defendants central argument in support of their Motion

to Dismiss Count Five has already been resolved by the Court. Defendants had argued that as a matter of law, Horiuchi's shot was reasonable, or in the alternative, that Horiuchi was entitled to qualified immunity. The Court rejected these arguments in the discussion earlier in this decision.

 The Court shall, however, dismiss the allegations of a Fifth Amendment violation, once again relying on *Graham.* Defendants assert that the remaining Fourth Amendment claim must be dismissed because the Defendants other than Horiuchi are sought to be held liable under a respondeat superior theory. A federal official may only be held personally liable for damages based on his individual actions, and cannot be held liable on a respondeat superior theory. *Hamilton v. Endell,* 981 F.2d 1062 (9th Cir. 1992). In *Hamilton,* the Circuit held that a supervisor could be held liable for the constitutional torts of his subordinate only "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Id.* at 1067 (quoting from *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989)).

The Second Amended Complaint asserts that the Defendants drafted the Special Rules of Engagement with the intent to encourage the HRT to attempt to kill Harris. These allegations do not simply assert that Horiuchi's superiors are responsible due to their position, but rather assert that they actively encouraged the shooting. This is sufficient under *Hamilton.*

In conclusion, the Court shall dismiss the Fifth Amendment allegations from Count Five but will leave the Fourth Amendment allegations.

### 6. Motion to Dismiss Count Six

Harris conceded that Count Six should be dismissed and the Court will so order.

### 7. Motion to Preserve Evidence

 Harris has filed a Motion to Preserve evidence, asserting his suspicions that the Defendants may destroy or alter items of evidence returned to them after the criminal trial. The Government has filed a response indicating it has no objection to an Order forbidding the destruction of evidence, but objecting to Harris's attempt to prohibit even the transfer of evidence. The Court agrees with the Government's Proposed Order. There is no evidence here that the Defendants are actually destroying evidence. The Defendants do need to be able to transfer and handle the evidence in the conduct of routine legal tasks. The Court shall therefore grant in part Harris's Motion to Preserve Evidence, and will enter the Government's Proposed Order.

### 8. Stay of Discovery

On December 21, 1995, the Court entered a limited stay of discovery, with certain deadlines to be met when the Motions to Dismiss were resolved. This decision will resolve the Motions to Dismiss and trigger the deadlines set forth in that December 21, 1995 Order.

### V.

### ORDER

In accordance with the views expressed in the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Motion to Dismiss (Docket No. 33) filed by Defendants Cooper and Roderick be, and the same is hereby, GRANTED IN PART AND DENIED IN PART. The Motion is granted to the extent it seeks to dismiss Count One, and the Fifth and Sixth Amendment violation claims from Counts Two and Three. The Motion is denied in all other respects.

IT IS FURTHER ORDERED, that the Motion to Dismiss (Docket No. 36) filed by the other Defendants shall be, and the same is hereby, GRANTED IN PART AND DENIED IN PART. The Motion is granted to the extent it seeks to dismiss the Fifth Amendment claims from Counts Four and Five, and to the extent it seeks to dismiss Six. The Motion is denied in all other respects.

IT IS FURTHER ORDERED, that the Motion to Preserve Evidence (Docket No. 11) shall be, and the same is hereby, GRANTED IN PART AND DENIED IN PART. The

Motion is granted to the extent that no party shall purposely destroy, alter, or abandon any original or nonduplicative documents or physical evidence that relate to this action. This Order does not apply to duplicative copies of documents or the performance of any other routine tasks related to the conduct of the litigation. The Motion shall be denied in all other respects.