Kevin L. HARRIS, Plaintiff–Appellee,

v.

Arthur RODERICK, Defendant,

and

Lon T. Horiuchi, Defendant–Appellant.

Kevin L. HARRIS, Plaintiff–Appellee,

v.

Arthur RODERICK, Defendant,

Richard Rogers, Defendant–Appellant,

Steve McGavin, Defendant–Appellant,

Les Hazen, Defendant–Appellant,

Dale Carnege, Defendant–Appellant,

William Gore, Defendant–Appellant,

and

Eugene F. Glenn, Defendant–Appellant.

Kevin L. HARRIS, Plaintiff–Appellee,

v.

Arthur RODERICK, Defendant,

and

G. Wayne "Duke" Smith, Defendant–Appellant.

Kevin L. HARRIS, Plaintiff–Appellee,

v.

Arthur RODERICK, Defendant,

and

Larry Potts, Defendant–Appellant.

Kevin L. HARRIS, Plaintiff–Appellee,

v.

Arthur RODERICK, Defendant–Appellant,

Larry Cooper, Defendant–Appellant,

Jose Antonio "Tony" Perez, Defendant–Appellant,

Henry Hudson, Defendant–Appellant.

Nos. 96–35780, 96–35781, 96–35782, 96–35783 and 96–35784.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1997.

Decided Sept. 25, 1997.

Michael L. Martinez, Holland & Knight, Washington, DC, for defendant-appellant G. Wayne "Duke" Smith.

Charles S. Leeper, Spriggs & Hollingsworth, Washington, DC, for defendants-appellants Arthur Roderick, Larry Cooper, Jose Antonio "Tony" Perez, and Henry Hudson.

Kathleen H. Quimby, Williams & Connolly, Washington, DC, for defendants-appellants Richard Rogers, Steve McGavin, Dale Carnege, William D. Gore, Eugene F. Glenn, and Les Hazen.

Patricia Maher, Shwalb, Donnenfeld, Bray & Silbert, Washington, DC, for defendant-appellant Lon T. Horiuchi.

David Z. Nevin and Ellison Matthews, Nevin, Kofoed & Herzfeld, Boise, Idaho, for plaintiff-appellee.

Before: REINHARDT and THOMAS, Circuit Judges, and SEDWICK, District Judge.[*]

REINHARDT, Circuit Judge:

Kevin Harris brought a *Bivens*[1] action against thirteen named federal law enforcement agents, as well as several unnamed individuals and the United States for their actions at Ruby Ridge, Idaho during two days in August 1992. The individual defendants moved to dismiss the complaint, in part on the basis of qualified immunity. The district court granted the motion to dismiss in part, but denied the motion with respect to almost all of the Fourth Amendment claims. The defendants appeal the denial of qualified immunity with respect to the remaining claims, which constitute the heart of Harris's action, and seek dismissal of his complaint in its entirety. We reject the defendants' arguments in toto and affirm the applicable rulings of the district court.

## Background

We state the facts, as we must on this appeal, as they are set forth in Kevin Harris's Second Amended Complaint.

On August 21, 1992, six Deputy United States Marshals ("Marshals"): Arthur Ro-

---

[*] The Honorable John W. Sedwick, United States District Judge for the District of Alaska, sitting by designation.

[1] *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

derick, Larry Cooper, William Degan, Thomas Norris, Joseph Thomas, and David Hunt,[2] came onto Randall Weaver's property in Boundary County, Idaho to serve an arrest warrant upon Weaver. Kevin Harris was living on the Weaver property. Cooper, Degan, and Roderick confronted Harris, Weaver, Weaver's 14–year–old son, Sammy, and the Weaver family dog, Striker, at the "Y," the intersection of two roads near the Weaver property. As Striker was heading home in response to Weaver's call, Roderick shot and killed him. After his dog was killed, Sammy fired two shots in Roderick's direction, turned, and began to run home calling out "I'm coming, Dad...." Cooper and Degan, who were hiding in the woods, then fired their guns. One of the two, most likely Degan, shot at the gun Sammy was holding, and severely injured his arm. Cooper then shot at Sammy after he was disarmed and while he was continuing to run away. The final shot hit Sammy in the back, killing him.

A "melee" of firing erupted prior to the time Sammy was killed. Harris states he fired one or more shots into the woods in the direction of those he thought were trying to kill him as well as the others. He asserts, however, that those shots were fired in self-defense because he believed that he had to return the fire in order to protect his own life and that of Sammy. Degan was killed during the firestorm when a single round struck his upper shoulder. Harris admits that he may have fired the fatal shot.

Following this, the initial Ruby Ridge incident, Harris alleges that Cooper and Roderick met and conspired to lie about the events that occurred at the "Y." Harris maintains that, in order to conceal their wrongdoing, Cooper and Roderick decided to say that Harris was the aggressor—that he had initiated the firing and had not acted in self-defense. Their falsehoods, according to Harris, were intended to absolve them of responsibility for the deaths of both Degan and Sammy Weaver and to shift the blame to him.

After the initial shootings, the FBI dispatched a special unit designed to deal with crisis situations, called the "Hostage Rescue Team" (the "Team"). The Team, which was under the command of Richard Rogers, is composed of two types of agents: snipers and assaulters. The Team normally operates under the FBI's Standard Rules of Engagement which "provide that an FBI agent may kill a person with whom he or she comes into contact only when the person presents an immediate risk of death or great bodily harm to the agent or another person." However, a group of FBI and Marshal Service officials decided to rewrite the Rules of Engagement and create Special Rules of Engagement for Ruby Ridge. The Special Rules first provided that "*any* armed adult observed in the vicinity of the Weaver cabin could and should be killed," but were then narrowed to read "any armed adult *male*" in order to eliminate the possibility that the Team would fire at Vickie Weaver, Randall Weaver's wife. Furthermore, Harris alleges that the agents involved represented to other agents that the situation at the Weaver property was a "continuing firefight" although there had been no firing of weapons for 32 hours.

During the afternoon of August 22, 1992, after being told by Rogers to follow the Special Rules, several members of the Team took positions on a hill overlooking the Weaver cabin. This group included Lon T. Horiuchi, a Team sniper, who, according to Harris, was a highly trained marksman equipped with a thick-barreled .308 caliber bolt action rifle. Harris alleges that with that combination of skill and equipment Horiuchi could hit a quarter-inch target at 200 meters.

At about 6:00 p.m. that evening, Weaver, his daughter Sarah, and Harris, who were in the cabin and unaware of the presence of the Team agents stationed on the hill, decided to go to the shed where they had placed Sammy's body after they had washed it and prepared it for burial. After arriving at the shed, Weaver reached up to open the latch and was shot in the back by Horiuchi. Weaver yelled to his wife, Vickie, that he had been shot and began to run back to the cabin, as did Sarah and Harris. Vickie, with her infant daughter Elisheba in one arm, held the outer cabin door open with the other. The complaint alleges that Horiuchi then fired a second shot in an effort to kill

2. Marshals Norris, Thomas, and Hunt are not parties to this action.

both Harris and Vickie. The bullet passed through the clear glass in the open door, striking Vickie in the head, and after passing through her, hit Harris in the upper arm and chest. Vickie Weaver was killed instantly.

After the shooting ended, FBI personnel drove a military tank onto the front yard of the Weaver property and, using a loudspeaker, announced their presence. Harris remained in the cabin, despite a shortage of food and water, for eight days, during which time the FBI employed a variety of tactics designed to lure those remaining in the cabin outside. These tactics included the constant playing of loud music, the use of bright lights at night to prevent the Weavers and Harris from sleeping, referring to Vickie as if she were still alive, and taunting the cabin's occupants with descriptions of the food that was available to the agents. The FBI also installed cameras and microphones around the cabin and placed a remote-controlled robot with a shotgun attached aimed at the door. Harris, badly injured and in pain, alleges that he repeatedly asked his cabin-mates to shoot him in order to end his suffering. Vickie's body rested on the kitchen floor wrapped in blankets all the while. There is no indication in the complaint who, if anyone, in addition to Elisheba, Sarah, Weaver, and Harris, may have remained alive and in the cabin.

After eight days, Harris surrendered. He was taken to the hospital where he was treated for his injuries and underwent surgery. He was in intensive care for about twelve days.

Harris was then indicted in the United States District Court for the District of Idaho on a number of charges relating to the events of August 21 and 22. The charges included assault with a deadly weapon on Roderick, Cooper and Degan, as well as first degree murder of Degan. After a jury trial, he was acquitted on all charges.

### Proceedings Below

Harris then brought this *Bivens* action in the district court, alleging violations of his Fourth, Fifth, and Sixth Amendment rights, for the actions that took place at Ruby Ridge. Harris sued the following thirteen individuals: Deputy Marshals Arthur Roderick and Larry Cooper; Deputy Director of the United States Marshal's Service G. Wayne "Duke" Smith; Directors of the United States Marshal's Service, Jose Antonio "Tony" Perez and Henry Hudson; FBI Special Agent and Director of the Hostage Rescue Team, Richard Rogers; Larry Potts, Assistant Director of the FBI in charge of the Criminal Division; FBI Special Agent and Member of the Team Lon T. Horiuchi; FBI Special Agent and Supervisor of the Team, Steve McGavin; FBI Special Agent and Team Sniper Coordinator Les Hazen; FBI Special Agent and Team Logistics Coordinator, Dale Carnege; and FBI Special Agents William D. Gore and Eugene F. Glenn.

Harris claims that his Fourth Amendment rights were violated when Cooper and Roderick, by their actions—principally their fabrication and dissemination of a false account of the initial shooting incident—caused him to be shot and to suffer nearly fatal physical injuries; subsequently, he contends, the deputies' actions led to his arrest without probable cause and his wrongful prosecution for the murder of Marshal Degan. Harris next alleges that all thirteen named defendants conspired to and did deny him his Fourth Amendment rights by their preparation, authorization, and dissemination of the Special Rules of Engagement. More specifically, he contends that the Special Rules led Team sharpshooter Horiuchi to shoot and seriously wound him, in violation of his Fourth Amendment right to be free from the application of excessive force. He also seeks to hold Horiuchi directly liable for the shooting.

Defendants moved to dismiss the various counts for failure to state a claim and on the ground of qualified immunity. In a published opinion, *Harris v. Roderick,* 933 F.Supp. 977 (D.Idaho 1996), the district court denied the motions with respect to almost all of the Fourth Amendment claims.[3] Defendants appealed.

---

3. In Count One Harris alleged that Roderick and Cooper denied him his Fourth Amendment right to be free from unreasonable seizures and his substantive due process right under the Fifth Amendment when they shot *at* him at the "Y."

The court dismissed that count on the ground that Harris was not seized during the incident. *Harris,* 933 F.Supp. at 984. In Count Six, Harris asked for declaratory relief in the form of a

## I. THE CONSPIRACY TO SHIFT THE BLAME TO HARRIS FOR THE INCIDENT AT THE "Y"

In Counts Two and Three of his complaint, Harris alleges that Cooper and Roderick knowingly and intentionally conspired to and did deprive him of his Fourth Amendment rights by falsely telling other agents that he was the aggressor at the "Y" and that he did not act in self-defense, thereby causing the other agents to inflict on him the subsequent Fourth Amendment injuries he suffered. Cooper and Roderick lied, Harris claims, in order to conceal their own responsibility for the deaths of Degan, Sammy Weaver, and the dog Striker, and to falsely shift the blame to him. Moreover, Cooper and Roderick repeated these allegations before a grand jury leading to Harris's federal indictment and prosecution on charges stemming from the events at the "Y" and at the Weaver residence. They also repeated the false story at Harris's federal jury trial. We review Cooper's and Roderick's claims relating to qualified immunity and reject them in their entirety.

### A. Heightened Pleading Standard

█ Cooper and Roderick first argue that Harris's complaint fails to meet the heightened pleading standard required for *Bivens* conspiracy claims. *Branch v. Tunnell*, 937 F.2d 1382, 1386 (9th Cir.1991) (*Branch I*); *see also Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir.1992) (requiring conspiracy complaint to "allege specific facts to support the existence of a conspiracy among the defendants"). The heightened pleading standard must be met in cases in which the subjective intent of the defendant is an element of the claim. *Branch I*, 937 F.2d at 1386. In order to survive a motion to dismiss, plaintiffs alleging a conspiracy to deprive them of their constitutional rights must "include in their complaint nonconclusory allegations containing evidence of unlawful intent or face dis-

missal prior to the taking of discovery." *Id.* These allegations may be supported by either direct or circumstantial evidence. *Id.* at 1387. This standard is not intended to be difficult to meet as "[i]t serves the limited purpose of enabling the district court to dismiss 'insubstantial' suits prior to discovery and allowing the defendant to prepare an appropriate response, and where appropriate, a motion for summary judgment based on qualified immunity." *Id.* at 1387 (quoting *Whitacre v. Davey*, 890 F.2d 1168, 1171 (D.C.Cir.1989)). It is for the latter reason that "heightened pleading" is relevant for purposes of a qualified immunity appeal.

█ In his complaint, Harris alleges that after the gunfight in which Degan, Sammy Weaver, and the dog Striker were killed, "Larry Cooper and Arthur Roderick met separately and apart from the other Marshals, and constructed a false story about what had happened in the gunfight, which false story was designed to conceal their own and William Degan's criminal, civil, and moral responsibility for the deaths of Sammy Weaver and William Degan." Harris also alleges that Cooper and Roderick repeated this story in official documents, reports, and under oath before both a grand and petit jury. As a result of these falsehoods, Harris claims that he was denied his right to be free from unreasonable seizure as guaranteed by the Fourth Amendment. More specifically, he alleges that the falsehoods led directly to Horiuchi's shooting and seriously wounding him, his imprisonment in the Weaver cabin for eight days and at the hospital for two more weeks after that, and ultimately to the bringing of false charges against him that resulted in the federal murder trial at which he was acquitted on all counts. Finally, he contends, the falsehoods caused him to serve time in jail awaiting trial on the federal charges.

In *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457 (9th Cir. 1994),[4] the plaintiffs, environmentalists who

---

holding that the Special Rules were unconstitutional. Harris subsequently agreed that this count should be dismissed, and the district court did so. *Harris*, 933 F.Supp. at 988. In addition, Harris alleged a number of other Fourth and Sixth Amendment claims that were dismissed by the district court. None of the claims that were dismissed is before us on this appeal.

4. Although *Mendocino* was a case alleging conspiracy under § 1983, we observed in *Branch v. Tunnell*, 14 F.3d 449, 450 (9th Cir.1994) (*Branch II*) that the analysis for both § 1983 and *Bivens* actions was the same where the defendant's subjective intent is an element of the claim.

had participated in the planning and execution of a nonviolent anti-logging rally, alleged that federal and state law enforcement officials formed a " 'federation or consortium' " with one another ... to 'disrupt, suppress and neutralize' the program and its organizers." *Id.* at 459. More specifically, they claimed that after a bomb was detonated in one of the plaintiff's cars, law enforcement officials intentionally released false information to the press that was made to "smear them and other [organization] members as terrorists and violent fanatics." *Id.* at 460. Two organizers were ultimately charged with transportation of explosives. *Id.* at 459. The complaint alleged that the plaintiffs were arrested without probable cause and that the agents supplied false information to the magistrate, leading to the issuance of a search warrant. Both the state and federal officials moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the ground that it did not meet the heightened pleading standard required by *Branch I.* We held that the allegations in the complaint met the *Branch I* standard because they described the parts of the warrant affidavit that were false and asserted that those portions of the warrant were necessary to a probable cause determination. Although the complaint did not specifically allege which of the four named FBI officials actually supplied the information that led to the incorrect warrant affidavit, we held that the failure to do so cannot serve as a basis for granting a motion to dismiss. We pointed out "only the FBI agents can answer" that question and, therefore, the plaintiffs must be allowed to take discovery on the point. *Mendocino,* 14 F.3d at 463.

We hold that Harris met the heightened pleading standard with respect to the conspiracy he alleges occurred between Cooper and Roderick, and that the complaint was adequate to permit defendants to assert their qualified immunity defense. Harris's complaint alleged two major overt acts. First, after the shootings of Degan, Sammy Weaver, and Striker, Cooper and Roderick met separate and apart from the other Marshals and constructed a false story about how the initial gunfight came about and what occurred during its course. Second, the complaint alleges, Cooper and Roderick told the false story to other agents and reiterated

it during official (federal) investigations, at two (federal) preliminary hearings, before a (federal) grand jury, and at a (federal) jury trial. The malicious falsehoods, he claims, led to the shooting of Harris by Horiuchi as well as to Harris's arrest, detention and federal prosecution on various charges. Harris's allegations are detailed and specific and clearly meet the heightened pleading requirements of *Branch I* and *Mendocino.* He pleads with particularity as to which defendants conspired, how they conspired and how the conspiracy led to a deprivation of his constitutional rights, even though he does not identify which officer said or did what at which particular time.

### B. The Causal Relationship

■ Cooper and Roderick claim that they are entitled to qualified immunity as to Counts Two and Three because even if they did lie about the events at the "Y," the falsehoods were not the "actual cause" of Harris's shooting, forcible arrest, and prosecution. They argue in effect that the various occurrences relating to Ruby Ridge are too attenuated to permit a finding that they committed a constitutional violation. We disagree.

We have explained the nature of the causation required in cases of this kind in *Johnson v. Duffy,* 588 F.2d 740 (9th Cir.1978). There, we held that for purposes of § 1983 liability the requisite causal chain can occur through the "setting in motion [of] a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743–44. There is little question here that Cooper and Roderick should have known that falsely placing the blame for the initial Ruby Ridge incident on Harris would lead to the type of constitutional injuries he suffered.

Harris's complaint states that both Cooper and Roderick lied about the events at the "Y" by portraying him as the aggressor and the culpable party, and that their falsehoods were the proximate cause of a series of constitutional injuries, including his shooting by Horiuchi, his being trapped in the Weaver home for eight days while suffering severe pain from his wounds, and his subsequent arrest, jailing and trial on various federal charges, including Degan's murder, all in vio-

lation of his Fourth Amendment rights. The allegations are sufficient to meet the rule set forth in *Johnson.*[5]

▆ Cooper and Roderick contend that Harris's actions at the "Y," even as they are described in his complaint, were sufficient to give rise to probable cause for his arrest and detention for the crime of assaulting a federal officer in violation of 18 U.S.C. § 111 (1994).[6] They argue that because probable cause existed to arrest Harris independent of any lies that they may have told, the causal chain was broken. Here, Harris's complaint alleges that he acted in self-defense, and that had Cooper and Roderick told the truth about what occurred, he would not have been arrested for the shooting of Degan, let alone

shot and almost killed by an FBI sniper.[7] Given the conflicting factual assertions, we cannot say as a matter of law that independent probable cause existed or that it served to break the causal chain. Moreover, the complaint states that because of the conspirators' falsehoods Special Rules were promulgated that directed that Harris and others be shot on sight if in possession of a weapon when spotted. We cannot assume that the Special Rules would have been adopted if Cooper and Roderick had been truthful in their reports. In short, under all of the circumstances, we cannot say, on the basis of the complaint, that in the absence of Cooper and Roderick's falsehoods, Harris would have suffered the constitutional deprivations he incurred.

5. The defendants' reliance on *White v. Roper,* 901 F.2d 1501 (9th Cir.1990) is misplaced. In that case White, a prisoner, brought suit alleging that a guard physically forced him to enter a cell of another hostile inmate. White then ran away, and as a result of his confrontation with other prison guards, suffered cuts and bruises. He brought a § 1983 claim alleging "deliberate indifference" or an "intent to punish" in violation of the prisoner's due process rights. *Id.* at 1503. In that case, we held that for claims alleging deliberate indifference or intent to punish, White had to prove that the officer's actions were the "but for" cause of White's injuries. *Id.* at 1505. Harris, however, is not claiming deliberate indifference and thus the standard that is applicable to his pleading is that described in *Johnson.*

6. § 111. Assaulting, resisting, or impeding certain officers or employees
 (a) In general—Whoever -
 (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with [a federal law enforcement officer] while engaged in or on account of the performance of official duties . . .
 shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year. . . .

7. While an offender does not have to know that the person he is shooting at is a federal officer, *see United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Supreme Court has not foreclosed the possibility that the state of mind of the one accused of assault can be relevant for purposes of determining whether he had the requisite criminal intent to commit assault. The Court noted in *Feola,* "[f]or example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his

property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent." *Id.* at 684, 95 S.Ct. at 1264.

Furthermore, as with traditional types of assault, defense of self is a defense to the charge. This court has recognized "a defense to assaulting a federal agent based on the defendant's honest mistake of fact or lack of knowledge that the victim is a law enforcement officer. This defense consists of (1) a mistake or lack of knowledge as to authority, (2) a reasonable belief that force was necessary to defend against an immediate use of unlawful force, and (3) the use of no more force than appeared reasonably necessary." *United States v. Morton,* 999 F.2d 435, 437–38 (9th Cir.1993) (citations and footnote omitted). Furthermore the component requiring mistake or lack of knowledge does not relate necessarily to whether the accused knew the officer was a federal agent, "but with whether the defendant recognized that the agent was authorized to act in the manner which allegedly provoked the purported self-defense." *Id.* at 438 n. 1; *see also United States v. Span,* 75 F.3d 1383, 1388 (9th Cir.1996) (*Span II*) ("a person has a right to resist an officer who is using excessive force"). Put another way, "[t]he right of self-defense 'is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct.'" *Span II,* 75 F.3d at 1389 (*quoting United States v. Span,* 970 F.2d 573, 580) (9th Cir.1992) (*Span I*)). We also held in *Span I* that "an individual has a limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic." 970 F.2d at 580. Because this case is before us as an appeal from a motion to dismiss, the plea of self-defense is relevant to the question of probable cause, given the allegations alleging a conspiracy to shift the blame for the initial incident from the officers involved to Harris.

 Finally, Cooper and Roderick argue that, because the individuals who actually executed the warrant and detained Harris are entitled to qualified immunity, they, too, are entitled to such immunity, at least with respect to the arrest and detention. While Cooper and Roderick are correct that officers who reasonably believe that there is probable cause to arrest a suspect are entitled to qualified immunity, it does not follow that Cooper and Roderick are entitled to immunity in this case. The complaint alleges that the arresting officers acted on the basis of falsehoods wilfully created and disseminated by Cooper and Roderick. Cooper and Roderick are not entitled to qualified immunity for such conduct if it served as the basis for the arresting officers' beliefs. Officers who in good faith relied on Cooper and Roderick's reports may well be able to assert a successful qualified immunity defense based upon *Hunter.* The fabricators of a false story that misled them cannot.

Cooper and Roderick could not reasonably have been under any illusion that they could lawfully conspire to concoct and disseminate false reports and escape responsibility for the consequences of their misdeeds. It was reasonably foreseeable that the alleged falsehoods would lead to the unconstitutional shooting, as well as to the unlawful detention and wrongful prosecution of Harris. The allegations in Harris's complaint are sufficient to plead the requisite causal relationship.[8] *See Johnson,* 588 F.2d at 740.

### C. The False Testimony

 Cooper and Roderick contend that they have absolute immunity from claims that they gave false testimony: a) in official reports; b) before the grand jury that indicted Harris on the federal charges; and c) at his trial on those charges. They argue that even if they were not initially entitled to

immunity for their pretrial statements, any problems in that respect were cured when the grand jury indicted Harris, thus determining that there was probable cause. This argument reflects the same specious reasoning that the two deputies employed in contending that they were immune for causing a false arrest because the arresting officers acted in good faith. The argument here is, in essence, that if a conspiracy to lie is so successful that on the basis of the lies a grand jury finds probable cause, the conspirators become immunized for the constitutional injury they have caused. We disagree. In *Hand v. Gary,* 838 F.2d 1420, 1426 (5th Cir.1988), the Fifth Circuit examined the question whether state actors could assert immunity from liability for malicious prosecution simply because an indictment was obtained, regardless of the circumstances surrounding its return. The *Hand* court concluded that a finding of probable cause that is "tainted by the malicious actions of the government officials [involved]" does not preclude a claim against the officials involved. *Id.* We adopt the *Hand* reasoning.

 The more difficult question, however, is whether Cooper and Roderick are entitled to immunity because law enforcement officers enjoy absolute immunity for false testimony in a variety of official fora, including the fora at issue here. While Cooper and Roderick are correct that police officers are generally entitled to absolute immunity for perjury committed in the course of official proceedings, *Briscoe v. La-Hue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), complaining witnesses who wrongfully bring about a prosecution generally are not. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).[9] Harris is alleging that Cooper and Roderick's actions were function-

---

**8.** We should reiterate that for purposes of this appeal we are required to assume that the allegations of the complaint are true. The defendants have chosen to appeal at a stage of the proceedings at which they have not yet even filed an answer to Harris's charges. That is a tactical decision they are free to make, *Behrens v. Pelletier,* 516 U.S. ——, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), and any adverse consequences that may ensue are simply a result of their voluntary choice. This is so even though we recognize that Harris's complaint appears to be inconsistent in

part or to omit material events that may have a significant impact on the ultimate outcome on Counts Two and Three. (Compare, *e.g.,* paragraphs 31 and 34 of the complaint in respect to the location of Cooper and Degan during the initial shooting incident.)

**9.** *Malley* denied absolute immunity to officers whose testimony served as the basis for obtaining an arrest warrant. Warrant cases appear to constitute a separate line from those involving other more direct types of testimony. *See Hervey v.*

ally those of a complaining witness. When Cooper and Roderick conspired to construct a false story about the events that took place at the "Y," they deliberately set in motion a series of events that they anticipated (or should have anticipated) would lead to Harris's indictment, arrest, and federal trial for the murder of Officer Degan, a charge of which he was ultimately acquitted. Not only did Cooper and Roderick set the events in motion but, according to the complaint, they voluntarily provided crucial information, false though it was, at every step of the proceedings.

 While we have extended the absolute immunity that exists for the testimony of law enforcement officials at the trial stage to other fora, including grand juries,[10] we have not considered the question whether there is an exception to the absolute immunity rule with respect to law enforcement witnesses who serve functionally as complaining witnesses. In other words, we have not determined whether *Malley* provides an exception to *Briscoe.* The Second, Fifth, Seventh, and Tenth Circuits have expressly concluded, however, that law enforcement officials are not entitled to absolute immunity for false testimony when they function as complaining witnesses. In announcing its holding, the Second Circuit in *White v. Frank,* 855 F.2d 956, 959 (2d Cir.1988), reasoned that because complaining witnesses were not entitled to absolute immunity at common law, officers who function in that capacity are not entitled to such immunity under § 1983. The court said:

> initiating a baseless prosecution [is cognizable under § 1983], [because] his role as 'complaining witness' renders him liable to the victim under section 1983, just as it did at common law, and the fact that his testimony at a judicial proceeding may have been the means by which he initiated the

prosecution does not permit him to transpose the immunity available for defamation as a defense to malicious prosecution.

*White,* 855 F.2d at 961; *see also Anthony v. Baker,* 955 F.2d 1395, 1400 (10th Cir.1992) (holding that the question of immunity for testimony given by law enforcement officials "hinges on whether [they] acted as a complaining witness or a lay witness."); *Enlow v. Tishomingo County,* 962 F.2d 501, 512 (5th Cir.1992) (holding that disputed issues of fact as to whether officer served as a complaining witness precluded immunity finding). In *Curtis v. Bembenek,* 48 F.3d 281, 285 (7th Cir.1995), the Seventh Circuit also recognized that a claim for malicious prosecution may be brought against a police officer, under appropriate circumstances. We agree with the reasoning of the other circuits and hold that if Cooper and Roderick functionally served as complaining witnesses who may be said to have initiated Harris's prosecution they are not entitled to absolute immunity for their false statements.[11]

 The facts here present an even stronger case for providing an exception to the general rule than did those in the other circuits' cases. Here, Cooper and Roderick were not simply complaining witnesses. The thrust of Counts Two and Three is that Cooper and Roderick conspired to cover-up their own misdeeds and to shift the blame to Harris by fabricating and disseminating a false version of the events that occurred at Ruby Ridge. The subsequent official testimony was simply a part of the implementation of that conspiracy, a step in the overall plan. We do not believe that the general policy that immunizes false official testimony requires that we preclude Harris from showing the full range of occasions on which Cooper and Roderick's falsehoods were uttered, simply because some of them occurred before a grand or petit jury.[12]

---

*Estes,* 65 F.3d 784 (9th Cir.1995). However, as we explain further in the text *infra,* this circuit has not yet decided whether the reasoning of *Malley* should be extended to other types of cases and applied whenever an officer functions as a "complaining witness."

**10.** *See Little v. City of Seattle,* 863 F.2d 681, 684 (9th Cir.1988).

**11.** There is also a minority view. The Third Circuit in *Kulwicki v. Dawson,* 969 F.2d 1454 (3d

Cir.1992), expressly rejected the reasoning of *Baker* and *White* and refused to read the complaining witness exception in *Malley* as overriding the broad protection for law enforcement witnesses set forth in *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

**12.** We are aware that following submission of this appeal Harris was charged by a county prosecutor with the murder of Degan in violation of the law of the state of Idaho. Ronald J. Ostrow,

## II. THE SPECIAL RULES AND THEIR CONSEQUENCES

In Count Four, Harris alleges that all thirteen named defendants conspired to deny him his Fourth Amendment right to be free from excessive force when they altered the FBI's official policy on deadly force embodied in the Rules of Engagement. Harris claims that the conspirators knew (or should have known) when they authorized the Special Rules of Engagement that the new rules would lead to an excessive and unconstitutional use of force by federal agents against individuals then present at Ruby Ridge, including Harris. He alleges that in furtherance of the conspiracy, Rogers, Smith, McGavin, Horiuchi, and Carnege traveled to Idaho from the Washington, D.C. area. Then, he alleges, all thirteen named defendants conferred with each other either in person, by telephone, or in writing, and decided to formulate the Special Rules of Engagement, which permitted officers to "kill any armed adult observed near the Weaver residence, irrespective of whether the armed adult presented an immediate threat of harm to the agent or to another person." [13] As noted *supra*, "adult" was shortly changed to "adult male."

The defendants raise two principal arguments with respect to Harris's claim regarding the Special Rules of Engagement. First, they argue that Harris's conspiracy claim does not meet the "heightened pleading" requirement for *Bivens* conspiracy claims. Second, they urge that they are entitled to qualified immunity. We address both arguments.

### A. Heightened Pleading

 With respect to the "heightened pleading" requirement, we agree with the district court that Harris's conspiracy claim meets that standard. As we have already noted, the standard requires that the complaint include "nonconclusory allegations containing evidence of unlawful intent or face dismissal prior to the taking of any discovery." *Branch v. Tunnell*, 937 F.2d 1382, 1386 (9th Cir.1991) (*Branch I*). Like the district court, we conclude that Harris has sufficiently pleaded nonconclusory allegations to survive a motion to dismiss with respect to each of the moving defendants. He alleges that several defendants traveled from Washington, D.C., and that they all met or spoke together regarding the formulation of the Special Rules of Engagement, which contemplated, and in fact led to, Harris's being shot and seriously wounded in violation of the Fourth Amendment. The allegations are sufficient to overcome the defendants' motion to dismiss.[14]

### B. Qualified Immunity

 The defendants' argument that they are entitled to qualified immunity for their actions requires a more detailed analysis. The purpose of qualified immunity is to effect a balance between the rights of persons residing in this country to be free from blatant constitutional violations and the need to ensure that the larger needs of society are met and that law enforcement personnel are not unnecessarily diverted from their duties. *Harlow v. Fitzgerald*, 457 U.S. 800, 813–14, 102 S.Ct. 2727, 2735–36, 73 L.Ed.2d 396

---

*FBI Sniper is Charged in Ruby Ridge Killing*, L.A. Times, Aug. 22, 1997, at A1 (describing how Harris was charged with murder of Degan and Horiuchi was charged with involuntary manslaughter in Vickie Weaver's death). Neither side has suggested that this development affects our decision. In any event, nothing in our decision precludes any party from calling the state prosecution to the attention of the district court following remand for whatever purpose may be appropriate.

**13.** While Horiuchi states in his brief that members of the Team *were given* the Special Rules of Engagement, that is not how the actions are characterized in Harris's complaint which asserts that all thirteen named defendants helped

to draft, or acquiesced in the drafting of, the Special Rules of Engagement, after conferring together.

**14.** The defendants argue that Harris has not sufficiently stated what each officer did in the drafting of the Special Rules of Engagement. However, Harris is not required to do more than he has done. *See Mendocino Envtl. Ctr. v. Mendocino County*, 14 F.3d at 463 and discussion *supra* at 1195–96; *see also Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir.1986) (holding that jury could reasonably conclude that certain officers were liable despite the fact that the plaintiff, because he had been pushed to the ground, could not identify all the officers involved).

(1982). Under the doctrine, law enforcement officers who are wrongdoers may sometimes escape the economic consequences of their actions. Officials who perform discretionary functions are afforded "qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). As we have held repeatedly, "[a] law enforcement officer is entitled to qualified immunity in a [*Bivens* ] action ... [if], in light of clearly established principles governing the conduct in question at the time of the challenged conduct, the officer could reasonably have believed that the conduct was lawful." *Mendoza v. Block,* 27 F.3d 1357, 1360 (9th Cir.1994); *see also Alexander v. County of Los Angeles,* 64 F.3d 1315, 1319 (9th Cir.1995); *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir. 1991).

■ In order to determine whether the defendants are entitled to qualified immunity, we engage in a two-pronged inquiry: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993); *see also Mendoza,* 27 F.3d at 1360. Harris alleges that the Special Rules of Engagement permitted the unconstitutional use of deadly force. Defendants respond that Harris has failed to allege the violation of a clearly established right. The specific questions we must decide are as follows: was it clearly established that the deadly force prescribed by the Special Rules violated constitutional requirements and should reasonable officers drafting the Special Rules have known that such was the case?

In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. at

1872. Ordinarily, our "inquiry is ... whether the totality of the circumstances, (taking into consideration the facts and circumstances of the particular case including the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade by flight) justified the particular type of seizure." *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991). In *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985), the Court held that the use of deadly force "to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." Furthermore, the Court observed that "[i]t is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.*

■ Certain principles are clearly established under the cases described above and others that implement the fundamental rules regarding the use of deadly force. Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons. *See Curnow,* 952 F.2d at 325 (holding that "police officers could not reasonably have believed that the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time"); *Ting v. United States,* 927 F.2d 1504, 1511 (9th Cir. 1991) ("It was generally established at the time of the shooting that an officer could use deadly force to effectuate an arrest if, under the circumstances, he reasonably believed that such force was necessary to protect himself or others from serious bodily harm."). Moreover, whenever practicable, a warning must be given before deadly force is employed. *Garner,* 471 U.S. at 11–12, 105 S.Ct. at 1701–02.[15]

15. We recognize the need for officers on the scene to make immediate on-the-spot judgments. *See Garner,* 471 U.S. at 32, 105 S.Ct. at 1712 (O'Connor, J., dissenting). That factor plays little, if any, part, however, in an assessment of the reasonableness of the conduct of persons preparing Rules or Regulations governing the conduct of law enforcement officers in the field.

■ It is clear that the Special Rules that required the FBI agents to kill *"any* armed adult male" in the vicinity of the Weaver cabin mandated an unconstitutional use of force, and that no reasonable officer could have believed otherwise. The Rules instructed the officers that they "could and should" kill any adult male armed with a weapon in the vicinity of the Weaver cabin, regardless of whether he was threatening the officers or any other persons. No mention of a warning is made anywhere in the Special Rules. Instead, the Special Rules constituted a shoot-on-sight edict. Although an officer had been killed in a shootout and armed persons believed to be responsible for his death remained in the area, so extreme an order is patently unjustified.

The regular Rules of Engagement, which were changed by the defendants for the Ruby Ridge assault, provide that "an FBI agent may kill a person with whom he or she comes into contact only when the person presents an immediate risk of death or great bodily harm to the agent or another person." These Rules were clearly designed to comply with the requirements of the Constitution as explicated by the federal courts. The alteration of those Rules, to require that *"any* armed adult observed in the vicinity of the Weaver cabin could and should be killed," constitutes a gross deviation from constitutional principles and a wholly unwarranted return to a lawless and arbitrary wild-west school of law enforcement. The Special Rules violated clearly established law and any reasonable law enforcement officer should have been aware of that fact.

Defendants also appear to contend that they enjoy qualified immunity because the individual who actually shot Harris enjoys qualified immunity for his conduct. The argument is similar to the one advanced by Cooper and Roderick with respect to the arresting officers. It is a causation or proximate cause argument, essentially, and this time there are two clearly dispositive answers to it. First, whether Horiuchi's shooting of Harris lies at the end of the causal chain that started with the promulgation of the Special Rules, or whether that causal chain was broken because Horiuchi had cause to shoot Harris under the regular Rules of Engagement, is a fact question that

cannot be resolved on a motion to dismiss. At this stage of the proceedings, the only facts before us reveal that Horiuchi was instructed to follow the Special Rules and that he then shot Harris. Second, it is extremely doubtful, for reasons we explain in the next section, that Horiuchi will ever be able to establish that he is entitled to qualified immunity for his conduct in shooting Harris. Certainly, as the record now stands, he cannot do so.

## III. THE SHOOTING OF HARRIS BY HORIUCHI

■ In Count Five Harris alleges that the force used on him by Horiuchi was unreasonable because he "had committed no crime, posed no threat to the safety of officers or others, was not seeking to flee, and had not been warned of the presence of law enforcement officers or of their demand that he surrender." Harris alleges that Horiuchi initially shot Weaver. He did so as Weaver was opening the door to the shed where his dead son Sammy's body lay. After Weaver was shot, Harris, Weaver, and Weaver's daughter Sarah, began to run toward the cabin, as they feared for their lives. As Harris entered the cabin, Horiuchi fired, hitting Vickie Weaver. The bullet passed through her body and landed in Harris's upper arm and chest. Harris seeks to hold not only Horiuchi liable for his injury but a number of Horiuchi's superiors.

### A. Horiuchi

Horiuchi advances two main arguments in support of his claim for qualified immunity. First, he argues that the use of force was objectively reasonable under the circumstances. Second, he argues that any law to the contrary was not clearly established.

Horiuchi asserts that, independent of the mandate in the Special Rules that deadly force be used whenever an armed male is spotted near the Weaver cabin, the law at the time permitted law enforcement officials to use whatever force was objectively reasonable under the circumstances to effectuate an arrest, and, under the circumstances, the force he actually used was reasonably necessary to arrest Harris. In support of his

argument, he relies upon *Graham* and the objective reasonableness test it announced. However, Horiuchi's actions simply do not pass the *Graham* test, which, as we have noted, requires a careful examination of all the facts and circumstances, viewed from the perspective of a reasonable officer on the scene.

Horiuchi asserts that the shot he fired while Harris was trying to return to the cabin was objectively reasonable because Harris presented a greater danger when he was in the cabin than when he was outside, and it was therefore necessary to prevent him from reentering. One of the many problems with Horiuchi's argument is that the force he used was designed to kill Harris, not simply to stop him from reentering the cabin. That under all of the circumstances Harris's effort to return to the cabin he had left only minutes before did not justify so extreme a measure should have been apparent to any reasonable law enforcement officer.

Harris went to the shed with Randy Weaver and his daughter Sarah to help minister to the body of Weaver's dead son. Even though Harris was armed, he made no aggressive move of any kind when Horiuchi started shooting; instead, with the others, he ran back toward the cabin from which they had recently emerged. Examining Horiuchi's actions from the perspective of a reasonable law enforcement officer faced with the need to make on-the-spot decisions, it is plain to us that his actions were not objectively reasonable. *Graham*'s totality of the circumstances test does not permit the use of deadly force to kill a suspect who is running back to a cabin where he is temporarily staying and who makes no threatening movement of any kind, even though the suspect had engaged in a shoot-out with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers.

Horiuchi's shooting of Harris, is also plainly inconsistent with *Tennessee v. Garner*, which is the leading Supreme Court precedent regarding the use of deadly force. *Garner* holds:

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. at 11, 105 S.Ct. at 1701. Horiuchi's shooting of Harris was not objectively reasonable. Harris was returning to the cabin, not escaping. Horiuchi gave him no warning and no opportunity to surrender or to otherwise cease his resistance to the exercise of lawful authority. The fact that Harris had committed a violent crime in the immediate past is an important factor but it is not, without more, a justification for killing him on sight. Horiuchi and his fellow officers were safely ensconced on the hill overlooking the Weaver cabin. No threatening movement was made by Harris with respect to Horiuchi or anyone else, even after Horiuchi shot Randy Weaver. The law that deadly force may not be used under the circumstances present when Horiuchi killed Vickie Weaver and seriously wounded Harris was clearly established under *Graham, Garner, Ting,* and *Curnow,* and no reasonable officer could have thought otherwise.[16]

Horiuchi contends that Harris has not alleged a violation of clearly established law because he has not presented any case involving similar circumstances. Horiuchi misconceives the requirements of qualified immunity law. Harris need not present a factually similar case in order to show that his constitutional rights were clearly established. Although the contours of the established right must be "sufficiently clear[,] . . . [t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of

---

**16.** Horiuchi's reliance on *Hegarty v. Somerset County,* 53 F.3d 1367 (1st Cir.), *cert. denied,* ——— U.S. ———, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995), is misplaced. In *Hegarty,* the police shot a wom-an who was known to be unstable and was pointing a gun at them through the paper-thin walls of her cabin. The officers lives were clearly in danger. *Id.* at 1377.

preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. at 639, 107 S.Ct. at 3039 (citation omitted). The Court recently repeated this maxim in *United States v. Lanier*, — U.S. —, —, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997), when it observed that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." It also cited a particularly cogent observation from the Seventh Circuit: "[t]he easiest cases don't even arise. There has never been ... a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the official would be immune from damages liability." *Lanier*, — U.S. at — – —, 117 S.Ct. at 1227–28 (quoting *United States v. Lanier*, 73 F.3d 1380, 1410 (6th Cir.1996) )(Daughtrey, J., dissenting) (quoting *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir.1990)). As we held in *Mendoza*, "when 'the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous preexisting case law is not required to show that the law is clearly established." *Mendoza*, 27 F.3d at 1357 (quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993)).[17]

Here, the generally applicable law was clearly established in *Graham* and *Garner* and the other cases discussed *supra*. Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed. Whenever practicable, a warning must be given so that the suspect may end his resistance or terminate his flight. A desire to prevent an armed suspect from entering the place he is residing because it may be difficult to persuade him to reemerge is insufficient cause to kill him. Other means exist for bringing the offender to justice, even if additional time and effort are required. When Horiuchi shot Harris, without any warning, as he was retreating toward an area of safety, he acted in a patently unreasonable manner that violated clearly established law. That the conduct at issue violated Harris's constitutional rights should have been plain to any reasonable officer.

## B. The Other Defendants

Finally, Harris claims that Horiuchi was aided and abetted by the other twelve named defendants when he denied Harris his clearly established Fourth Amendment rights. Although appellants are correct that federal officials are only liable for their own actions, and cannot be held liable under a respondeat superior theory, Harris does not contend that the other defendants are liable simply because they were Horiuchi's supervisors. Rather, Harris alleges that the other defendants actively encouraged Horiuchi's actions through the formulation of the Special Rules of Engagement, and that the issuance of the Special Rules was a precipitating cause of the shooting. We held in *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989), that "[a] supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *See also Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992) (reversing grant of summary judgment because prison officials who knew of inmates illness and allowed his condition to worsen could face liability). Harris alleges that the twelve named defendants developed the plan that resulted in his shooting and encouraged Horiuchi to fire at him. Those allegations are sufficient to state a claim under *Taylor* and *Hamilton*.

## Summary

The complaint alleges that Cooper and Roderick conspired to cover-up their own

---

**17.** Horiuchi relies on *In re City of Philadelphia Litigation*, 49 F.3d 945, 971 (3d Cir.), *cert. denied*, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995). In that case, several city officials, after armed combat with members of the MOVE organization who refused to leave their headquarters, decided to use an explosive device to remove a bunker in order that agents could enter the house through the roof. *Id.* at 949–51. Although lives were lost, that was not the intended result. The Third Circuit, in holding that several city officials were entitled to qualified immunity, recognized that the purpose of the mission was to bring the MOVE members out of their headquarters, not to kill them. *Id.*

wrongdoing and to shift the blame for the initial shootout at the "Y" from themselves to Harris. In furtherance of this conspiracy, the complaint continues, the two officers concocted a false story, filed false official reports, and testified falsely before the grand jury and at Harris's federal trial. The complaint further alleges that the false reports led directly to Harris's near-fatal shooting, as well as to his subsequent arrest, detention and federal trial. The officers do not enjoy qualified immunity for such conduct.

The complaint also asserts that the thirteen defendants, working together, promulgated the Special Rules which required FBI agents to "shoot on sight" in order to "kill." The Rules directly infringed on the clearly established constitutional rights of those at whom they were aimed, including Harris. There is no qualified immunity for such conduct, either. Finally, the complaint alleges that in shooting Harris without warning, when he was retreating to the cabin, Horiuchi violated his clearly established constitutional rights. Because the law was firmly established that such a shooting contravenes the Fourth Amendment, and because a reasonable officer could not have believed that it was reasonable to shoot Harris under such circumstances, we affirm the district court's refusal to dismiss this portion of the complaint as well.

### Conclusion

We hold that the officers named in Harris's complaint are not, on the basis of the record before us, entitled to qualified immunity for the actions that took place at Ruby Ridge in August 1992. The case is remanded to the district court for further proceedings consistent with this opinion.

AFFIRMED AND REMANDED.