W. FIGUEROA, et al., Plaintiffs,

v.

Daryl GATES, et al., Defendants.

No. Civ.00–4158 ABC.

United States District Court,
C.D. California.

June 11, 2002.

Marion R. Yagman, Stephen Yagman, Yagman & Yagman & Reichmann, Venice Beach, CA, for Plaintiffs.

Cory M. Brente, Kelly N. Kades, Los Angeles, CA, for Defendants.

COLLINS, District Judge.

This case arises out of the shooting deaths of two men, Jose Figueroa and Mario Guerrero (the "decedents"), by the Los Angeles Police Department ("LAPD") Special Investigations Section ("SIS"). Forty-one defendants have moved for summary judgment or, alternatively, for a summary adjudication of issues and for bifurcation of the *"Monell"* claims for municipal liability.[1] The motions came on regularly for hearing before this court on June 10, 2002. At the conclusion of oral argument, the Court took the matter under submission to consider several new authorities cited by the parties. For the reasons indicated below, Defendants' Motion for Summary Judgment is GRANTED

1. Plaintiffs have filed a request for certification under *Chuman v. Wright,* 960 F.2d 104 (9th Cir.1992), should the Court deny Defendants' summary judgment motion based on the existence of genuinely disputed issues of material fact. Defendants have not opposed this request.

IN PART and DENIED IN PART, and their Motion for bifurcation of the *"Monell"* claims is GRANTED.

## I. STANDARD ON A MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION OF ISSUES

The Court may grant summary adjudication on a particular claim, defense, or issue under the same standards used to consider a summary judgment motion. *See* Fed.R.Civ.P. 56(a), (b); *Pacific Fruit Express Co. v. Akron, Canton & Youngstown R.R. Co.,* 524 F.2d 1025, 1029–30 (9th Cir.1975).

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978); *Fremont Indemnity Co. v. California Nat'l Physician's Insurance Co.,* 954 F.Supp. 1399, 1402 (C.D.Cal.1997).

If, as here, the moving party has the burden of proof at trial (*e.g.,* a plaintiff on a claim for relief, or a defendant on an affirmative defense), the moving party must make a "showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting from Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). Thus, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis in original); *see Calderone,* 799 F.2d at 259.

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... **must set forth specific facts** showing that there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the Court must view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

When a motion for summary judgment or summary adjudication asserts the defense of qualified immunity, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged...." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "[T]he next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case...." *Id.* at 201, 121 S.Ct. 2151.

## II. STATEMENT OF FACTS [2]

The LAPD SIS is a special unit "whose purpose was to interdict and apprehend

**2.** The Court notes that both Defendants'     Statement of Uncontroverted Facts and Plain-

armed, violent career criminals." *Cunningham v. Gates,* 229 F.3d 1271, 1278 (9th Cir.2000) (as amended). On July 12, 1999, the SIS officers were assigned to begin a surveillance operation of Oswaldo Arevalo, a male Hispanic. The SIS officers were told that Arevalo and another Hispanic male were suspected of committing a series of armed robberies. Decl. of Joe Callian ¶¶ 4–5; Decl. of Brian Davis ¶¶ 4–5.[3] In particular, the individuals were suspected of committing "take over" style robberies of travel agencies, robbing employees of blank airline tickets. Decl. of Dean Gizzi ¶ 5. SIS officers trailed Arevalo from July 12, 1999, to August 13, 1999. Callian Decl. ¶ 6; Davis Decl. ¶ 6.

On the morning of August 14, 1999, surveillance began at Arevalo's residence, 19400 Hatton Street. Callian Decl. ¶ 6–7. Detectives Callian and Avila observed Arevalo drive to a gas station in a gray 1991 Lincoln Continental and purchase gas, then return to the residence. Callian Decl. ¶ 8.

Later that morning, Arevalo and Manuel Echevarrio left the house and entered a purple 1996 Toyota RAV–4. Decedents, Jose Figueroa and Mario Guerrero, also left the house and entered the Lincoln. Decl. of Larry Winston ¶ 7. Detectives Gizzi and Spelman followed Arevalo and Echeverria in a Toyota to a parking lot at 17050 Chatsworth Street. Gizzi Decl. ¶ 9. Arevalo exited the Toyota and walked toward the building. Gizzi Decl. ¶ 10. Figueroa and Guerrero parked nearby. Winston Decl. ¶ 7. Arevalo apparently[4] exited the building and met with Figueroa and Guerrero. Echevarria then picked Arevalo up and drove away from the building. *Id.* ¶ 8. Figueroa and Guerrero exited the Lincoln and entered the building, leaving 10 or 15 minutes later with a plastic trash bag. They reentered the Lincoln and drove away. *Id.* ¶ 9.

The officers continued to trail the two vehicles. They received a radio transmission that a robbery had occurred at 17050 Chatsworth Street and the suspects were armed with guns. *E.g.,* Gizzi Decl. ¶ 12.[5]

As he followed the Lincoln, Detective Davis, one of the members of the surveillance team, observed Guerrero, the passenger, "moving about the front passenger seat … 'doing something weird.' " He states in his declaration that he observed Guerrero "to be removing or putting something on and then climb[ing] over the front seat to the rear seat." Davis Decl. ¶ 13.

When the Lincoln reached the Hatton Street residence, Detectives Gizzi and Spelman parked directly behind it. Detective Gizzi identified himself as a police

tiffs' Statement of Controverted Facts are entirely unhelpful. Defendants' Statement consists of a mere 14 facts, none of which have anything to do with the shooting at issue. Plaintiffs' Statement is a mere reiteration of their opposition brief. Accordingly, the Court has had to construct a statement of facts, and determine whether any material facts are actually in dispute, with virtually no assistance from the parties.

3. Except as noted, Plaintiffs' objections to Defendants' evidence are not well-taken and are overruled.

4. Defendants have not provided the Court with declarations from officers who saw the following events. The officers' statements about the radio transmissions are not hearsay as long as they are merely offered for their effect on the officers rather than for their truth.

5. Defendants have not provided the Court with a declaration from Detective Bennett, who made this radio transmission. The other officers' statements about what they heard are hearsay if admitted for the truth of the matter—that Figueroa and Guerrero were, in fact, armed. But it is not hearsay if admitted merely for the effect on the officers, that they believed that the suspects were armed.

officer and ordered Figueroa and Guerrero to raise their hands. Gizzi Decl. ¶ 14; *see also* Decl. of Richard Spelman ¶ 13 ("I shouted, 'Police, put your hands up.'"). Detective Gizzi observed Guerrero rise from the back seat and turn toward the officers. Gizzi Decl. ¶ 14. Detective Spelman saw Guerrero raise his hand, holding a dark object, which Detective Spelman states in his declaration appeared to be a handgun. Spelman Decl. ¶ 13.

"Suddenly, Detective Spelman shouted 'Gun.'" Gizzi Decl. ¶ 15. Detective Spelman fired one round. Spelman Decl. ¶ 14. After Detective Rodriguez observed Guerrero turn his head toward the officers, he fired two rounds at Guerrero. Decl. of Rodney Rodriguez ¶ 15. Guerrero climbed into the front seat, then out of the front passenger window, landing on the pavement. He rose to his knees, facing away from the officers, "with both hands concealed at his front waistband." Detective Gizzi again identified himself as a police officer and ordered Guerrero to raise his hands. Guerrero did not comply, but he turned his head toward the officers, with his hands in front of his body. Gizzi Decl. ¶ 15.

Meanwhile, Detective Rodriguez observed Figueroa exiting the vehicle, facing toward Detectives Spelman and Gizzi. Figueroa lifted his shirt and reached into his front waistband.[6] Detective Rodriguez fired one shot at him, Rodriguez Decl. ¶ 16, as did Detective Spelman. Spelman Decl. ¶ 14. Figueroa dropped to his knees and crawled toward the front of the car. Detective Rodriguez ordered him to raise his hands and move away from the vehicle. Rodriguez Decl. ¶ 16.

Detective Gizzi shot Guerrero. Gizzi Decl. ¶ 16. Detective Winston fired two rounds at Figueroa. Winston Decl. ¶ 13.

Both men were killed, having been shot in the back. Pls.' Ex. 9 at 133, 158. Both were unarmed. There was an unloaded gun and ammunition in the car. Spelman Decl. ¶ 16; Pls.' Ex. 6 at 8:4.

### III. PROCEDURAL HISTORY

Plaintiffs, who are relatives of the decedents, filed their initial Complaint on April 19, 2000, and their First Amended Complaint on June 19, 2000. Plaintiffs filed their Second Amended Complaint ("SAC"), which is the operative document, on June 27, 2000. Plaintiffs allege claims under the Civil Rights Act of 1872, 42 U.S.C. § 1983, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* Defendants are 72 named individuals who comprise eight groups: (1) former LAPD police chiefs, including Bernard Parks, who was still in office at the time of the shooting deaths; (2) former Mayor Richard Riordan, who was in office at the time of the shooting deaths; (3) the members of the Los Angeles City Council in office at the time of the incident; (4) former members of the Los Angeles City Council; (5) members of the Los Angeles Board of Police Commissioners (the "Board") who were in office at the time of the incident; (6) former members of the Los Angeles Board of Police Commissioners; (7) current and former members of the City Attorney's Office, including Mayor James K. Hahn; and (8) members of the SIS, including the officers actually involved in the shooting. SAC ¶ 4. All Defendants are sued in both their individual and official capacities. SAC ¶ 5.

On August 28, 2000, ruling on a motion filed by 10 Defendants, the Court dismissed the RICO claim as a matter of law. On November 3, 2000, ruling on a motion

---

**6.** Plaintiffs have raised a question about Detective Rodriguez's credibility. It is unclear how Detective Rodriguez could have seen Figueroa take these actions if Figueroa was facing away from him.

filed by 23 Defendants, the Court dismissed the claims against former Police Chief Willie Williams in his official capacity. On January 8, 2001, the Court granted Plaintiffs' motion to strike the affirmative defense of absolute immunity asserted by the City Council Defendants, but allowed Defendants to proceed on the qualified immunity defense. On March 29, 2001, the Court denied two motions to dismiss filed by nine Defendants.

The instant motions for summary judgment and bifurcation were filed by 41 Defendants [7] on March 25, 2002, and noticed for hearing on April 15, 2002. On March 27, 2002, the Court continued the hearing date to April 29, 2002, and set an extended briefing schedule. On April 17, 2002, the Court granted Plaintiffs' Ex Parte Application to further continue the hearing date to its present setting, June 10, 2002. Plaintiffs filed their opposition briefs to the summary judgment motion and the bifurcation motion, as well as a request for so-called *Chuman* certification, on April 29, 2002. Defendants filed a reply brief on the summary judgment motion on May 20, 2002. Defendants did not file a reply brief on the bifurcation motion.

## IV. DISCUSSION

Section 1983 creates a cause of action against any person who, acting under color of state law, violates the constitutional rights of another person. *See* 42 U.S.C. § 1983. Plaintiffs allege that Defendants violated decedents' Fourth and Fourteenth Amendment rights when the SIS "followed plaintiffs' decedents whom they believed would commit a crime;" "let decedents

commit the crime of robbery;" "took no action whatever to protect" the victims; allowed decedents to get away; and shot and killed decedents when they returned home. *See* SAC ¶¶ 16–25; 33–49. Defendants' motion for summary judgment on the Section 1983 claims is based on numerous grounds: that the SIS officers involved in the shooting are entitled to qualified immunity; that the members of the Board of Police Commissioners are entitled to qualified immunity; that the other SIS officers did not personally participate in the incident, have any supervisory authority, or have a duty to intervene; that Defendants Daryl Gates, Willie L. Williams, and Stanley Sheinbaum were not in office at the time of the incident; that the members of the City Council and the City Attorney did not act in bad faith in indemnifying police officers for the payment of prior punitive damages awards; and that former Mayor Richard Riordan had no direct power over police policy. The Court addresses each of these arguments in turn.

### A. The Shooting Officers are Not Entitled to Qualified Immunity

Defendants first seek summary adjudication of the claims against the officers involved in the shooting, Detectives Gizzi, Rodriguez, Spelman, and Winston, on the basis of qualified immunity. Under *Katz*, the first question is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [officers'] conduct violated a constitutional right[.]" 533 U.S. at 201, 121 S.Ct. 2151.[8] Plaintiffs allege that the shooting officers shot decedents in the back, killing them, even though they were

---

**7.** Daryl Gates, Willie L. Williams, Bernard Parks, Richard Riordan, Richard Alarcon, Hal Bernson, Laura Chick, Michael Feuer, Ruth Galanter, Michael Hernandez, Nate Holden, Mark Ridley–Thomas, Rudy Svorinich, Joel Wachs, Gerald Chaleff, Raquel de la Rocha, Herbert Boeckmann, Dean Hansell, T. Warren Jackson, Stanley Sheinbaum, James K. Hahn, Daniel Koenig, Jerry Brooks, Brian

Davis, Joseph Freia, Dean Gizzi, Edward Guiza, John Helms, Rodney Rodriguez, Richard Spelman, Lawrence Winston, Philip James Wixon, John Tortorici, Joe Callian, James Toma, Charles Bennett, Gary Holbrook, James Harris, Robert Kraus, James Kilgore, and Angela Krieg.

**8.** Defendants' motion misapplies the first question, asking whether Plaintiffs can "es-

unarmed and posed no reasonable threat to the officers or to anyone else. *See* SAC ¶¶ 21–27. These facts allege a constitutional violation.

■ Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). An officer's use of **deadly** force is reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). If, as alleged, decedents posed no threat to the officers or others, then the use of deadly force was patently unreasonable and violated the Fourth Amendment.

■ On the second prong of the qualified immunity analysis, "whether the right was clearly established," *Katz*, 533 U.S. at 201, 121 S.Ct. 2151, the Court asks whether " 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).[9] The clearly established "inquiry ... must be undertaken in light of the specific context of the case ...," *id.* at 201, 121 S.Ct. 2151, and with regard to the law at the time of the alleged violations. *See Anderson*, 483 U.S. at 639, 107 S.Ct. 3034. Contrary to Defendants' suggestion, in the Ninth Circuit, Plaintiffs need not produce a case directly on point to demonstrate that the right was clearly established. *See Deorle v. Rutherford*, 272 F.3d 1272, 1285–86 (9th Cir.2001) (as amended). The Court bears in mind that:

> [d]eadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. In other words, the court may not simply accept what may be a self-serving account by the police officer.

*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994) (citations omitted).

"Certain principles are clearly established ... that implement the fundamental rules regarding the use of deadly force. Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.1997). The Court must apply these principles in the specific context of this case—viewing the facts in the light most favorable to Plaintiffs—to determine if the officers[10] were on notice that their conduct was unconstitutional.

tablish" a constitutional violation, rather than if they have alleged a violation, and failing to consider the allegations in the light most favorable to Plaintiffs.

9. The veracity of the officers' statements that they believed that they were in danger is largely irrelevant to the question of qualified immunity, where the inquiry is whether "the

law ... put the officer[s] on notice that [their] conduct would be clearly unlawful[.]" *Katz*, 533 U.S. at 202.

10. Because the shooting officers' declarations are virtually identical as to what they saw, did, and believed, the Court sees no need to address each of them individually at this

The officers never saw decedents with weapons. *See* Gizzi Decl. ¶ 11; Rodriguez Decl. ¶ 11; Spelman Decl. ¶ 10; Winston Decl. ¶ 9. However, they were advised via radio transmissions that the two suspects in the robbery were armed with guns. *See* Gizzi Decl. ¶ 12; Rodriguez Decl. ¶ 12; Spelman Decl. ¶ 11; Winston Decl. ¶ 10. Decedents were parked in a driveway,[11] blocked in by police cars. *See* Gizzi Decl. ¶¶ 13–14; Rodriguez Decl. ¶¶ 13–14; Spelman Decl. ¶¶ 12–13; Winston Decl. ¶¶ 11–12. Detective Spelman asserts that he saw Guerrero raise his hand and point a dark object at the officers, which Spelman believed to be a gun. *See* Spelman Decl. ¶ 13. The officers demanded that decedents put their hands up, but decedents faced away from the officers with their hands concealed in their waistbands. *See* Gizzi Decl. ¶ 15; Rodriguez Decl. ¶ 16; Spelman Decl. ¶ 14; Winston Decl. ¶ 13. Decedents were shot in the back. *See* Pls.' Ex. 9 at 133, 158. The officers found an unloaded gun and ammunition in the car. *See* Spelman Decl. ¶ 16; Pls.' Ex. 6 at 8:4.

The officers' declarations suggest that the events at the residence unfolded rapidly, giving decedents little, if any, opportunity to comply with their orders. *See, e.g.,* Rodriguez Decl. ¶ 15 ("I heard Detectives Spelman and Gizzi identify themselves as police officers. This was followed by a detective who shouted 'Gun.' I then heard gunshots emanate from Detective Spelman and Gizzi's location."); Winston Decl. ¶ 12 ("I heard Detective Gizzi identify himself as a police officer and Detective Spelman shout 'Gun'. I then heard a gunshot come from the area of Detective Spelman and Gizzi's vehicle ...."); *see also* Dep. of Raquelle de la Rocha at 24:18–19 ("it all happened very quickly").

This case bears none of the hallmarks of the cases in which the Ninth Circuit and other courts have found excessive force defendants to be entitled to qualified immunity. Decedents never brandished their (unloaded) weapon, much less used it. *Cf. Pace v. Capobianco,* 283 F.3d 1275, 1282 (11th Cir.2002) (decedent had used his car as a deadly weapon); *Medina v. Cram,* 252 F.3d 1124, 1132 (10th Cir.2001) ("Mr. Medina communicated he had a gun[ ] [and] emerged from the house covering what could reasonably be interpreted as a weapon"); *Wilson v. Meeks,* 52 F.3d 1547, 1553–54 (10th Cir.1995) (the court found that the decedent had pointed a gun at the officer); *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994) (decedent had recently fired shots and was "acting 'crazy'"). Decedents did not flee. *Cf. Pace,* 283 F.3d 1275 (decedent was shot after a high speed chase); *Reese v. Anderson,* 926 F.2d 494, (5th Cir.1991) (decedent was shot after a high-speed chase that ended when his car spun out of control). Decedents did not actively resist arrest. *Cf. Medina,* 252 F.3d at 1127 (decedent continued to approach the officers after they attempted to stop him with less-lethal force, including beanbag rounds and an attack dog).

Defendants' reliance on their primary case, *Forrett v. Richardson,* 112 F.3d 416 (9th Cir.1997). *overruled on other grounds by* 9th Cir. R. 39–1.6, is particularly misplaced.[12] In *Forrett,* the decedent had al-

---

stage. *But see Cunningham v. Gates,* 229 F.3d 1271, 1287 (9th Cir.2000) ("in resolving a motion for summary judgment based on qualified immunity, a court must carefully examine the specific factual allegations against each individual defendant (as viewed in the light most favorable to the plaintiff)").

11. There is a dispute about whether decedents' car faced a fence or a garage. The Court is unable to resolve the dispute, in large part because of the poor quality of the photographs submitted. *See, e.g.,* Pls.' Ex. 11 at 207. The Court assumes, for purposes of this Motion, that decedents parked in front of a garage.

12. As an initial matter, the Court rejects any reliance on *Forrett* or *Anderson v. Russell,* 247 F.3d 125 (9th Cir.2001), both of which were

ready shot one victim at point-blank range, stolen a number of guns, knowingly eluded the police for an extended period of time in a residential area, and was in the process of scaling a backyard wall in order to escape when he was shot. He continued to flee despite numerous verbal orders and warning shots. Defendants cannot rely on *Forrett* to assert that it was clearly established that they could shoot two suspects, trapped in a driveway, who had given no indication that they would attempt to flee.

In contrast to the above-discussed cases, those cases in which courts have found the defendants not entitled to qualified immunity are much more closely analogous to this one. Viewing the facts in the light most favorable to Plaintiffs,[13] the officers were on notice that their actions were unlawful.

Courts have repeatedly held that excessive force defendants are not entitled to qualified immunity in cases where decedents did not have weapons on their persons, brandish weapons, or threaten to use them—even if the officers believed the decedents were armed. *See Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir.1997) (finding that shooting the plaintiff was not objectively reasonable where he had "made no aggressive move of any kind"); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir.1991) (finding that the defendants were not entitled to qualified immunity where, in one witness' version of the shooting, "Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time"); *Wilson v. City of Des Moines*, 160 F.Supp.2d 1038, 1040 (S.D.Iowa 2001) (finding that the defendants were not entitled to qualified immunity where they shot an unarmed man running across the field because "they thought they saw a firearm"). As in *Wilson*, this was "not a case where the officers **clearly** saw that the suspect had a weapon." *Id.* at 1042.[14]

Similarly, defendants are not entitled to qualified immunity where the decedent is in retreat or has made no attempt to flee. *See Harris*, 126 F.3d at 1203 (finding that shooting the plaintiff was not objectively reasonable where he was running "back toward the cabin from which [he] had recently emerged"); *cf. Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1148 (9th Cir.1996) (as amended) ("it was not reasonable for [the officer] to believe that Acosta posed a threat of great bodily injury or harm to him or to anyone else" so the "officer could not have reasonably believed that shooting at the driver of the slowly moving car was lawful"). As in *Harris*, decedents here had returned to the home they had left earlier in the morning.

Lastly, the Court notes that "[t]he primary focus of [its] inquiry ... remains on whether the officer was in danger at the exact moment of the threat of force." *Medina*, 252 F.3d at 1132. Accordingly,

decided on motions for judgment as a matter of law after trial. The Supreme Court made clear in *Katz* that the factual question of whether excessive force was used is different from the legal question of whether the defendants are entitled to qualified immunity. *See* 533 U.S. at 197, 121 S.Ct. 2151 ("the ruling on qualified immunity requires an analysis not susceptible of fusion with the question whether unreasonable force was used in making the arrest").

**13.** Defendants give lip service to this standard, but persist in presenting the facts in the light most favorable to the shooting officers.

**14.** The *Wilson* court also noted that no weapon was found at the scene of that shooting. An unloaded gun was found here, but the Court does not find the distinction relevant. There is no question that the plaintiffs in *Curnow* and *Harris* were armed. What matters is that they had not used the weapon in a threatening manner toward the officers before they were shot.

the fact that decedents might have been armed previously is largely irrelevant, if they did not pose a danger to the officers at the time they were shot. *Cf. Harris,* 126 F.3d at 1203 (finding defendant not entitled to qualified immunity "even though the suspect had engaged in a shoot-out with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers"). Viewing the facts in the light most favorable to Plaintiffs—decedents had not fled, had not threatened the officers with weapons, were not armed, and were facing away—the Court concludes that the shooting officers could not believed that using deadly force was lawful. Accordingly, they are not entitled to qualified immunity and the motion for summary judgment must be denied.[15]

## B. The Claims Against the Non–Shooting Officers are Dismissed

■ Defendants next seek dismissal of the claims against the non-shooting police officer defendants. The Court agrees that there is no evidence that any of these officers were involved in the shooting, had any control over the operations of the SIS or the actions of the shooting officers, set in motion any action that resulted in the shooting, or authorized, approved, or acquiesced in the shooting officers' conduct. *See* Decl. of Joseph Freia; Decl. of Daniel Koenig; Decl. of Jerry Brooks; Decl. of John Helms; Decl. of Philip James Wixon; Decl. of James Toma; Decl. of Gary Holbrook; Decl. of James Harris; Decl. of Robert Kraus; Decl. of Edward Guiza; Decl. of James Kilgore; Decl. of Angela Kreig; Decl. of John Tortorici; Decl. of Charles Bennett; Decl. of Brian Davis; Decl. of Joe Callian.

Plaintiffs have submitted no evidence in support of holding these officers liable.[16] The cases cited by Plaintiffs are inapposite. In *Fairley v. Luman,* 281 F.3d 913 (9th Cir.2002) (per curiam), and *Garcia v. Salt Lake County,* 768 F.2d 303 (10th Cir. 1985), the courts held that municipal governments could be held liable, but did not address whether individual officers could be held liable for actions that took place when they were not present. In *Grandstaff v. City of Borger, Tex.,* 767 F.2d 161 (5th Cir.1985), the court held that four officers could be held liable for the shooting death of decedent, even though it was unclear which officer had actually killed decedent. However, the officers were all present and involved in the "firestorm." *Id.* at 168. The Fifth Circuit explicitly distinguished a case like this one, *Dobson v. Camden,* 725 F.2d 1003 (5th Cir.1984), in which the defendants were not present or implicated in the incident. *See id.*

Because there is no evidence to support holding Defendants Freia, Koenig, Brooks, Helms, Wixon, Toma, Holbrook, Harris, Kraus, Guiza, Kilgore, Kreig, Tortorici, Bennett, Davis, and Callian liable for decedents' deaths, the claims against these Defendants are dismissed.

---

**15.** The Court notes that disputes of material fact also remain that prevent the Court from granting summary judgment to the shooting officers on the basis of qualified immunity. There are questions, for instance, about whether decedents' car faced a wall or a garage and how much time the officers gave decedents to comply before they started shooting. *Cf. Wilson v. City of Des Moines,* 160 F.Supp.2d at 1042 ("Without having a sufficient record or a factual determination of Mozee's actions in the unlit field, the Court cannot determine what level of threat Mozee posed to perform an analysis of whether the officer's mistake as to the law was reasonable.").

The Court need not address the "danger creation" theory of liability.

**16.** In particular, they have produced no evidence to support their position that Defendant Koenig implemented or approved an SIS policy that caused decedents' deaths.

## C. The Claims Against the Former Police Chiefs are Dismissed

■ The Court previously dismissed the "official capacity" claims against former Police Chiefs Williams and Gates. Defendants now seek dismissal of the individual capacity claims against the former police chiefs. Officials who were no longer in office at the time of the incidents in question may be held liable if they "adopted a plan or policy authorizing or approving the alleged unconstitutional conduct." *Heller v. Bushey*, 759 F.2d 1371, 1375 (9th Cir. 1985), *judgment vacated on other grounds sub nom. City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam). Aside from citing *Heller*, Plaintiffs have produced no evidence of policies implemented or approved by Gates and Williams. Even more significantly, Plaintiffs have produced no evidence of causation, linking any such policy to decedents' deaths. Accordingly, the claims against Gates and Williams are dismissed.

## D. Former Mayor Richard Riordan

■ Defendants seek dismissal of the claims asserted against former Mayor Richard Riordan. In *Cunningham v. Gates*, 229 F.3d 1271, 1281 n. 13 (9th Cir. 2000) (as amended), the Ninth Circuit stated in dicta that Mayor Riordan "was clearly entitled to qualified immunity." Because it was not a holding, the Court is not bound by that statement. But the Court does find it persuasive. Plaintiffs have produced no evidence of specific actions Riordan took that caused decedents' deaths or specific actions that he could have taken. More significantly, for qualified immunity purposes, the *Cunningham* decision suggests that Riordan could not be held legally liable for his actions. Accordingly, the claims against former Mayor Riordan in his individual and official capacities are dismissed.

## E. The Members of the City Council Who Voted to Indemnify the Defendants in Trevino Are Not Entitled to Qualified Immunity

Under California Government Code § 825(b):

a public entity is authorized to pay that part of a judgment [against a public employee] that is for punitive or exemplary damages if the governing body of that public entity, acting in its sole discretion except in cases involving an entity of the state government, finds all of the following:

(1) The judgment is based on an act or omission of an employee or former employee acting within the course and scope of his or her employment as an employee of the public entity.

(2) At the time of the act giving rise to the liability, the employee or former employee acted, or failed to act, in good faith, without actual malice and in the apparent best interests of the public entity.

(3) Payment of the claim or judgment would be in the best interests of the public entity.

Plaintiffs allege that "by always seeing to it that punitive damages awarded by juries against LAPD officers for civil rights violations would be paid by the City, and not by the LAPD officers," the City Council member Defendants have fostered "a custom of use of excessive force by LAPD officers, and especially the defendant officers in this action, who feel that, no matter how badly and how frequently they violated and violate the Fourth Amendment ..., they will be immunized from any civil penalty." SAC ¶ 42.

In *Navarro v. Block*, 250 F.3d 729 (9th Cir.2001), *rehearing denied*, Plaintiffs' counsel brought a similar § 1983 claim against the Los Angeles County Board of Supervisors. On the Board's appeal from

the district court order denying their motion for summary judgment, the Ninth Circuit held that "local legislators are not entitled to qualified immunity if they implement their state-created power to indemnify police officers from punitive damage awards in bad faith." *Id.* at 734 (citing *Cunningham v. Gates*, 229 F.3d 1271 (9th Cir.2000) (as amended)); *Trevino v. Gates*, 99 F.3d 911 (9th Cir.1996) (*"Trevino II"*); *see also Blumberg v. Gates*, 144 F.Supp.2d 1221 (C.D.Cal.2001) (denying motion to dismiss similar indemnification claim against the City Council).

Defendants seek summary judgment on the ground that there is no evidence that the City Council members ever voted to indemnify police officers in bad faith. Contrary to their suggestion, Plaintiffs bear the burden of producing evidence of Defendants' bad faith. *See Cunningham*, 229 F.3d at 1293 ("In order to defeat the council members' motion for summary judgment in the *Smith* case, Smith must present some evidence that the council members did not implement section 825's indemnification procedure in good faith....."). Plaintiffs have submitted transcripts of six City Council meetings in which indemnification for punitive damages awards was debated, and ultimately approved. *See* Pls.' Exs. AA (meetings on October 28, 1994, regarding *Tave v. City of Los Angeles*, No. CV 93–3238 ER (Mcx), and on April 17, 1996, and July 31, 1996, regarding *Guerra v. City of Los Angeles*, No. 92K40273), AAA (meetings on December 20, 1996, and January 8, 1997, regarding *Clarke v. Gates*, No. BC 101871, and on April 4, 1997, regarding *Trevino v. Gates*, No. CV 92–1981 JSL). Plaintiffs have also submitted related documentation. *See*

Pls.' Exs. BB, DD (City Attorney's recommendations in *Trevino v. Gates*, No. CV 92–1981 JSL, dated February 19, 1997, and in *Clarke v. Gates*, No. BC 101871, dated November 25, 1996).

Most of the transcripts and documents are irrelevant. *"Trevino II* draws a line in the sand. Indemnification decisions made before the opinion cannot give rise to personal liability[.]" *Blumberg*, 144 F.Supp.2d at 1225; *see also Cunningham*, 229 F.3d at 1293 ("the council members are clearly entitled to qualified immunity for lawsuits based on pre-*Trevino* decisions to indemnify officers against punitive damage awards"). The Ninth Circuit issued the *Trevino II* opinion on November 1, 1996. Accordingly, the Court will not consider any indemnification decisions prior to that date, including those in *Guerra* and *Tave*.[17]

Plaintiffs are left with their evidence regarding the *Trevino* and *Clarke* indemnification decisions.[18] The Ninth Circuit, in *Cunningham*, held that the *Clarke* deliberations "suggest[ ] that they [the City Council] implemented section 825's indemnification procedure in good faith in accordance with *Trevino.*" 229 F.3d at 1293. This Court is bound by that decision.

Plaintiffs contend that the *Trevino* indemnification vote was in bad faith because the transcripts "show no deliberations, no analysis—just a motion and a vote to pay because the city attorney said, pay." Opp'n at 16:10–11. The Court agrees that the deliberation and discussion—if the vote can even be characterized that way—in *Trevino* was extraordinarily short. The transcript comprises fewer

---

17. The bulk of Plaintiffs' opposition is devoted to a discussion of *Guerra* and *Tave,* which the Court does not consider.

18. There was apparently a third case after *Trevino II, Simmons v. City of Los Angeles,*

No. CV 95–6735 AHM (C.D.Cal.). *See* Motion at 36:12–14. Neither party has provided the Court with any evidence about the deliberations or vote in that case.

than six pages. There is only a single comment aside from the City Attorney's presentation, when Council Member Walters states: "[N]obody else is going to vote with me, but I would urge council members that you vote NO on the punitive damages." *See* Pls.' Ex. AAA at 138:20–22.

Furthermore, the transcript suggests that the City Council voted to indemnify based on its earlier vote in *Gomez v. Gates*, No. CV 90–856 JSL (C.D.Cal.). *See id.* at 135:19–22 ("These judgments arise out of the *Trevino* case, which is the same set of facts that occurred in the *Gomez* case, which you had previously voted to pay punitives on."). The Court cannot find that the City Council relied on its earlier *Gomez* vote in good faith. The *Gomez* deliberations and vote were heavily criticized by this Court, Judge Letts writing, in *Cunningham v. Gates*, 989 F.Supp. 1262, 1274 (C.D.Cal.1997) ("[N]o council member ever asked to see a transcript . . . , or even asked for a detailed summary of the testimony. The evidence does not reflect any discussion of the officer code of silence, or whether any officer testimony might have been tainted . . . . A jury could find that such 'deliberations' were not in good faith."), *affirmed in part and reversed in part by* 229 F.3d 1271 (9th Cir. 2000) (as amended). The Court will not take judicial notice of Judge Letts' factual findings, and the City Council members cannot be held liable for the *Gomez* vote, which presumably predated *Trevino II*, as the punitive damages in that case were awarded in 1992. Nevertheless, a jury could find that the City Council members were on notice that there were questions

about the good faith of the *Gomez* vote and did not act in good faith by relying solely on that earlier deliberation in voting to indemnify the officers in *Trevino*.[19]

■ Accordingly, the City Council members who voted to indemnify in *Trevino* are not entitled to qualified immunity.[20] Because this claim is asserted against the City Council members in their individual capacities, any member who voted not to indemnify is entitled to qualified immunity. Additionally, those members who were not present for the *Trevino* vote are entitled to qualified immunity. Plaintiffs suggest that those City Council members who did not vote in *Trevino* can be held liable for "shirking" their duties. But no case has ever suggested that liability could be imposed on this basis. Accordingly, the individual capacity claims against Mark Ridley–Thomas, *see* Decl. of Mark Ridley–Thomas ¶ 4, Ruth Galanter, *see* Decl. of Ruth Galanter ¶ 4, and Richard Alarcon, *see* Decl. of Richard Alarcon ¶ 4, are dismissed.

## G. There is No Evidence that Former City Attorney James Hahn Recommended Indemnification in Trevino

Defendants next seek summary adjudication of the claims against former City Attorney, now Mayor, James Hahn on the ground that, if the City Council members are not liable for voting to indemnify police officers, neither can the City Attorney be liable for advising them to do so. The Court has not dismissed the individual capacity claims against the City Council members and Defendants have provided no other grounds in support of the dismiss-

---

**19.** The law imposing personal liability on City Council members is clear. This decision is based solely on the disputed issue of whether the City Council members voted in good faith in *Trevino*, a question of fact.

**20.** The Court observes that Plaintiffs' burden of showing that a single indemnification vote in *Trevino* **caused** this shooting is steep. However, the Court also notes that several of the shooting officers here were named as defendants in *Trevino*.

al of the claims against the City Attorney.[21] However, there is no evidence that the only member of the office who has been served—James Hahn—acted in bad faith with respect to the *Trevino* vote. The member of the office, Daniel Woodard, who made the recommendation to the City Council in *Trevino, see* Pls.' Ex. AAA at 135:6–12, is named as a defendant, but has never been served (and therefore, is not a moving Defendant).[22] Plaintiffs have presented no evidence that James Hahn approved or participated in the recommendation.[23] Accordingly, the claims against James Hahn in his individual capacity will be dismissed.

## H. The Board of Police Commissioners and Chief Parks are Entitled to Qualified Immunity

Next, Defendants contend that the members of the Board of Police Commissioners, and former Police Chief Bernard Parks, are entitled to qualified immunity on the individual capacity claims that allege that these defendants failed to adequately supervise the SIS officers.[24] *See* SAC ¶¶ 9, 13–14 (alleging failure to investigate police misconduct and discipline police officers, particularly the SIS).

■ Liability may be imposed on supervisors under § 1983 if the plaintiff demonstrates " 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.' " *Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir.1991) (en banc) (quoting *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989)). " 'The requisite causal connection can be established ... by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' " *Id.* at 1447 (citing *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978)).

On the first step of the qualified immunity analysis, Plaintiffs have certainly alleged a violation of decedents' rights by the Board of Police Commissioners and Chief Parks. They have alleged that decedents' Fourth and Fourteenth Amendment rights were violated by the shooting officers, *supra,* and that the Board caused this violation by ratifying previous actions of the SIS. *See* Opp'n at 3–6.

As to the second prong of the qualified immunity test, the Court notes that Defendants—as is their right on a motion for summary judgment—have produced no ev-

21. The Court also notes that Defendants' argument is logically flawed. The City Council might engage in a good faith deliberation and come to its own conclusion that indemnification was proper even if the City Attorney's recommendation was made in bad faith. Of course, a plaintiff might not be able to demonstrate that his injury was caused by the City Attorney's bad faith in such a case.

22. The Court notes that Defendants have never sought dismissal of the unserved defendants.

23. The Court does not make any finding regarding the existence of good faith or bad faith. A jury might find that the City Attorney's office recommendation that the City Council rely on *Gomez* was made in bad faith.

There is simply no evidence that the only member of that office who has been served participated in that recommendation.

24. Defendants' reliance on *Cunningham,* Reply at 14, mischaracterizes the Ninth Circuit's decision. In *Cunningham,* the court concluded it did not have jurisdiction over the supervisory defendants' appeal because the district court had denied summary judgment based on material factual disputes. *See* 229 F.3d at 1292. As a result, the court's comment that "evidence of supervisor misconduct seems virtually non-existent" is dicta. The Court may—and does—find it persuasive, but is not bound by it.

The Court also notes that it disagrees that the outcome of *Cunningham* would necessarily be different after *Katz.*

idence demonstrating a lack of wrongful conduct or a lack of causal link between their conduct and decedents' deaths.[25] In contrast to the defense of the City Council members, there are no declarations from the members of the Board. Plaintiffs have produced evidence that the Board "examines every incident involving the discharge of a firearm, an in-custody death or other deaths resulting from or involving law enforcement." Decl. of Raymond Fisher ¶ 3. The Board reviews deadly force cases and determines whether the use of lethal force was "in policy" or "out of policy." *Id.* ¶¶ 4, 10–12. The Board was on notice that "police officers have been allowed to 'lie and deny' charges during a personnel investigation without suffering any disciplinary consequences." Pls.' Ex. 5 at 31. Finally, Plaintiffs have submitted a declaration by an expert witness that approving actions of the SIS officers as "in policy" "licenses SIS officers to believe that their accounts will be accepted without question even though their accounts are contradicted by objective evidence."[26] Pls.' Ex. 8 ¶ 6.

Plaintiffs rely in part on the 1991 Christopher Commission Report, which was critical of LAPD practices. For a discussion of the Christopher Commission Report, see *Cunningham v. Gates,* 989 F.Supp. 1262, 1266–67 (C.D.Cal.1997), *affirmed in part and reversed in part on other grounds by* 229 F.3d 1271 (9th Cir. 2000). In *Cunningham,* this Court, Judge Letts writing, denied the Board members' motion for summary judgment because "the jury may find, on the basis of the Christopher Commission Report and of both positive evidence and lack of contrary evidence that there has been no change.... A jury could also find that if excessive force was used by the SIS offi-

cers in this case, there is a causal connection between these policies and the use of force against Cunningham and Soly." 989 F.Supp. at 1268.

As in *Cunningham,* Defendants have produced no evidence that the Board's review of the SIS actions in lethal force cases has overcome these previously identified problems. *See id.* at 1268. But the Ninth Circuit, in the *Cunningham* appeal, noted its disagreement with Judge Letts' reasoning. *See Cunningham,* 229 F.3d at 1292 ("the evidence seems clearly to suggest that the commissioners took numerous steps to implement the recommendations of the Christopher Commission, and ... evidence of supervisor misconduct seems virtually nonexistent"). Here, too, the Court is presented with no evidence that the members of the Board have acted in bad faith in finding SIS actions to be "in policy."

Even Plaintiffs' evidence indicates that SIS "statistics do not necessarily indicate a pattern of excessive shootings." Decl. of Reva Tooley ¶ 5(c). Additionally, the Board's Office of the Inspector General has reported that the LAPD has engaged in "an increasing concerted effort to discipline officers for following the code of silence" about misconduct. *See* Pls.' Ex. 5 at 41.

Neither party has provided the Court with any relevant case law on supervisory liability that would have given the Board members notice that they could—or could not—be held liable for their actions with regard to the SIS. Plaintiffs' theory, that through policy and ratification, the Board and Police Chief fostered a custom of use of excessive force by SIS officers, is so similar to the theory of liability asserted

---

**25.** Defendants also continue to confuse the question of qualified immunity with the merits of the case. Whether Plaintiffs could ultimately prove causation goes to the merits.

**26.** The Court gives this five-year-old declaration little weight, as it does not review any SIS action after 1996. Pls. Ex. 8 ¶ 1.

against the City Council, that the Court concludes that the Board members were on notice by the *Trevino II* and *Cunningham* decisions that they could be held liable for approving SIS policy and use of lethal force in bad faith. Although Defendants have produced no evidence that the Board has acted in good faith since *Trevino II* and *Cunningham*, Plaintiffs' own evidence suggests that the Board is making strides to remedy the problems identified by the Christopher Commission. And the deposition of Raquelle de la Rocha indicates that, in this case, the Board deliberated in good faith before approving this shooting as "in policy." The Board considered the shooting incident twice, reconsidering it after submission of an audiotape of the incident. *See* Raquelle de la Rocha Dep. at 23–24.

■ Because there is no evidence of a pattern of bad faith since *Trevino II*, or even that the vote in this case was taken in bad faith, the past and present members of the Board of Police Commissioners are entitled to qualified immunity on the claims asserted against them in their individual capacities.[27] Plaintiffs have presented no evidence of any personal actions by Chief Parks for which he could be held liable in his personal capacity. According-

ly, Chief Parks is also entitled to qualified immunity for the claims asserted against him in his individual capacity.[28]

## I. Plaintiffs Have Produced Sufficient Monell Evidence as to the City Council, the City Attorney, the Board of Police Commissioners and Chief Parks

■ Defendants seek dismissal of all of the official capacity *"Monell"* claims on the ground that there is no evidence that the purported constitutional wrongs were committed pursuant to "official policy." Defendants fail to distinguish among the various groups of "official capacity" defendants. More significantly, Defendants fail to recognize that municipal liability under *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), may attach in other ways, including evidence of a **custom**. *See Mabe v. San Bernardino County*, 237 F.3d 1101, 1110 (9th Cir.2001). Plaintiffs have produced sufficient evidence that the City Council has a custom of indemnifying officers found liable for excessive force. The jury is not barred from considering pre-*Trevino II* decisions because *Trevino II* only "draws a line in the sand" on individual liability claims. Nor is the jury barred from considering decisions found by the

---

27. In the alternative, Defendant Stanley Sheinbaum is entitled to qualified immunity because his term on the Board ended before the *Trevino II* and *Cunningham* decisions. *See* Decl. of Stanley Sheinbaum.

This Court's decision in *Smith v. Gates*, No. CV 97–1286 CBM (RJGx), 2002 WL 226736, *3–5 (C.D.Cal. Feb. 5, 2002), Chief Judge Marshall writing, is not inapposite. Denying the individual Board members' motion for summary judgment, the Court concluded that, after *Trevino*, the Board members could be held individually liable despite the fact that the Board acts by majority rule. The Court did not address whether there was any evidence of bad faith presented in that case.

28. Nothing in the press release about the incident in question, *see* Pls. Ex. CC, indicates

that Chief Parks made any statement about the shooting.

The Court declines to order Defendants to turn over Chief Parks' report about the instant shooting at this stage. The report is irrelevant to the individual capacity claim against Chief Parks for two reasons. First, the report, even if authored and signed by Chief Parks, would have been written in his official capacity. Second, the report was authored after the incident and so could not have caused the use of excessive force. The report might be relevant to the official capacity claim against Chief Parks for ratification of the shooting, which does survive summary judgment.

Ninth Circuit to be in good faith. Even if a City Council vote to indemnify a single punitive damages award was taken good faith, a pattern of indemnification votes might constitute an unconstitutional custom. Accordingly, the official capacity claims against the City Council and its legal adviser, the City Attorney, may proceed.

▮▮▮ Municipal liability may also attach when a final policymaker ratifies both a subordinate's unconstitutional decision or action and the subordinate's basis for that decision or action. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *see also Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir.1992). Because it is undisputed that former Chief Parks and the Board of Police Commissioners approved the shooting in this case as "in policy," *see supra*, the Court concludes that the official capacity claims may proceed against the Board of Police Commissioners and the Police Chief on a ratification theory.[29]

## J. Bifurcation of the Monell Claims

Lastly, Defendants have filed a second motion to bifurcate the "individual capacity" claims from the *Monell* and punitive damages claims. Plaintiffs oppose, primarily on the ground that the *Monell* evidence would be repetitive of the evidence presented at the first phase of the trial. The Court disagrees. Individual liability evidence as to the City Council members is limited to the *Trevino* indemnification vote (as influenced by the *Gomez* vote). All other indemnification votes would be admissible only in the *Monell* phase. The Court finds that allowing evidence of the other votes would be confusing to the jury and unfairly prejudicial to the individual City Council members.[30]

Pursuant to this Order, there are no individual liability claims remaining against the Board of Police Commissioners and Chief Parks. The only remaining claim against the Board and Chief Parks is for the ratification of this particular shooting. The Court finds that the issues presented by the question of whether this vote was unconstitutional are distinct from any of the questions involved in the individual liability claims. Furthermore, if the officers are found to be not liable, then there would be no need to proceed to the *Monell* and punitive damages questions, as they are premised on a finding of unconstitutional action by the shooting officers. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).[31] Accordingly, the Court exercises its discretion to bifurcate the individual liability claims from the *Monell* claims. *See*

---

**29.** Although the *Monell* claim for ratification may proceed, the Court finds that there is no evidence of an unconstitutional policy or custom with regard to the Board and the Police Chief. Plaintiffs have certainly alleged that there is an unconstitutional custom. But they have provided no evidence of prior votes upon which a jury could conclude such a custom exists. The Court also finds that there is no *Monell* evidence as to the Mayor. The official capacity claims asserted against the Mayor will be dismissed.

**30.** Defendants' request to try the individual liability claims against the City Council members at the second phase would cause prejudice to those individuals, as the jury would hear not only about the *Trevino* vote, but the previous indemnification votes as well.

**31.** The Court is not persuaded by the concerns identified by Douglas L. Colbert in *Bifurcation of Civil Rights Defendants: Undermining Monell in Police Brutality Cases*, 44 Hastings L.J. 499 (1993). The Court does not believe that Plaintiffs' counsel is likely to fail to pursue the *Monell* claims as a result of bifurcation. *See id.* at 575, 577. The other concern, that the *Monell* claim would not proceed if the jury finds the individual officers not liable, *see id.* at 577–78, can be alleviated through the use of a special verdict form that asks the jury whether a constitutional violation was proven.

Fed.R.Civ.P. 42(b); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 320 (2nd Cir. 1999).[32]

The Court also exercises its discretion to bifurcate the punitive damages claim. It will promote convenience and efficiency to try the individual liability issues first. In their opposition, Plaintiffs request that compensatory damages be bifurcated from the individual liability claims and tried with the punitive damages claim. Defendants have not opposed this suggestion. Accordingly, the Court rules that all damages will be tried in a second phase of the trial, if necessary, along with the *Monell* claims.

For these reasons, Defendants' motion to bifurcate trial is granted.

## V. CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.[33] The claims against Defendants Freia, Koenig, Brooks, Helms, Wixon, Toma, Holbrook, Harris, Kraus, Guiza, Kilgore, Kreig, Tortorici, Bennett, Davis, and Callian in their individual and official capacities are hereby DISMISSED. The claims against former Police Chiefs Williams and Gates in their individual capacities are hereby DISMISSED. The claims against former Mayor Riordan in his individual and official capacities are hereby DISMISSED. The claims against Defendants Ruth Galanter, Richard Alarcon, and Mark Ridley–Thomas in their individual capacities are hereby DISMISSED. The claims against Defendant James Hahn in his individual capacity are hereby DISMISSED. The individual capacity claims against the current and former members of the Board of Police Commissioners and Chief Parks are hereby DISMISSED.[34]

Defendants' Motion to Bifurcate Trial is hereby GRANTED. The first phase of the trial will consist of the individual liability claims against the four shooting officers and the members of the City Council and City Attorney's office, except Defendants Galanter, Alarcon, and Ridley–Thomas. The second phase of the trial, if necessary, will consist of the *Monell* claims against the City Council and City Attorney's office, as well as the Board of Police Commissioners and Chief Parks, and determination of all damages awards.

---

**32.** This ruling is not intended to express any agreement with Defendants' assertion that evidence of prior incidents would be inadmissible against the shooting officers. Bifurcation of the remaining *Monell* claims is made without prejudice to further evidentiary rulings at the time of trial.

Defendants' argument that the individual claims against the City Council members should be tried at the second phase is largely dependent on an assumption that no evidence about prior shootings will be admitted against the officers. The Court is unwilling to make such an assumption at this stage.

**33.** Plaintiffs' request for *Chuman* certification is GRANTED IN PART. The motion for summary judgment on the basis of qualified im-

munity is denied as to the claims asserted against the shooting officers and the individual members of the City Council. The law imposing liability on these Defendants is clear. The motion is denied based on genuine disputes of material fact.

**34.** The following claims remain: the claims against the four shooting officers (Gizzi, Rodriguez, Spelman, and Winston); the individual capacity claims against the current and former members of the City Council (except Galanter, Alarcon, and Ridley–Thomas); the official capacity claims against the City Council and the City Attorney's office; and the official capacity claims against the Police Chief and the Board of Police Commissioners.